IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

|  |  |  |
|---|---|---|
| BRIAN WEGMAN, and<br>THOMAS HORROM | ) ) | |
| Plaintiffs, | ) | CASE NO. 6:23-cv-1637-RBD-RMN |
| V. | ) ) | |
| THE UNITED STATES SPECIALTY<br>SPORTS ASSOCIATION, INC.,<br>DONALD DEDONATIS, III,<br>RICHARD FORTUNA,<br>WENDY ANDERSON,<br>COURTNEY CEO, and<br>JACOB HORNBACHER, | ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

## FIRST AMENDED COMPLAINT

1.　　Plaintiffs Brian Wegman and Thomas Horrom (hereinafter separately referenced as, "Plaintiff Wegman" and "Plaintiff Horrom," respectively, or collectively "Plaintiffs Wegman and Horrom"), by and through their undersigned counsel, file the following Complaint against Defendants The United States Specialty Sports Association, Inc. ("Defendant USSSA" or "USSSA"); Donald DeDonatis III, CEO, USSSA ("Defendant DeDonatis"); Richard Fortuna, Chairman of the Board of Directors, USSSA ("Defendant Fortuna"); Wendy Anderson, General Counsel, USSSA ("Defendant Anderson"); Courtney Ceo, Vice President of Brand Management and Business Strategy ("Defendant Ceo"); and Jacob ("Jake")

1

Hornbacher, National Program Director and Michigan State Director, and cousin of Defendant DeDonatis ("Defendant Hornbacher"), collectively "Defendants," seeking monetary damages as well as attorneys' fees, litigation expenses, and other relief, and in support thereof alleges the following:

## I. JURISDICTION AND VENUE

2.    The Court has jurisdiction over the subject matter of this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961 et seq., (specifically 18 U.S.C. § 1964(c)), and 28 U.S.C. § 1331.

3.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' Florida State law claims for breach of contract, breach of covenant of good faith and fair dealing, breach of oral contract, breach of implied in fact contract, intentional interference with prospective economic advantage, whistleblower retaliation, negligent misrepresentation, breach of fiduciary duty, wrongful termination, defamation, and defamation per se.

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because USSSA's principal place of business is in this district; because Defendants DeDonatis, Anderson, Ceo, and Hornbacher reside in this district; and because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## II. PARTIES

5.    <u>Plaintiff Brian Wegman</u> was an employee of USSSA from 2014 until his unlawful termination on July 7, 2023.  Plaintiff Wegman began his career at USSSA in 2014 as an independent contractor.    After continued exemplary performance, Plaintiff Wegman was formally hired in 2019 to a full-time position as Vice President of Sport Development and Strategy.   Effective January 1, 2020, Plaintiff Wegman was promoted to serve as USSSA's Chief Operating Officer and continued to serve in that position until he was unlawfully terminated, in breach of his written Employment Agreement.  *See* Employment Agreement, dated January 1, 2022, *Exhibit 1*.

6.    Plaintiff Wegman is a resident of the State of Ohio.[1]  As a long-time friend and colleague of Defendant DeDonatis, and given his nearly ten-year career at USSSA, Plaintiff Wegman learned of, and often was direct witness to, the Defendants' violations of 18 U.S.C. §§ 1962(c) and (d), and Florida State law, by actively participating in the named RICO scheme to engage in illegal bookmaking and gambling, mail and wire fraud, defrauding the Internal Revenue Service ("IRS"), possession of illegal drugs, and by attempting to silence Plaintiffs from exposing the

---

[1] To assume the position as Chief Operating Officer, and as required under the terms of the Written Agreement dated January 1, 2022, Plaintiff Wegman resided in Florida at a rental house beginning in or about March 2022 in Melbourne, Florida, where he stayed at least Monday through Friday of each week.  Plaintiff Wegman and his wife jointly own their residence in Hamilton, Ohio.

3

Defendants' RICO activities, and Florida State law violations set forth herein.  In an attempt to raise concerns and bring about corrective actions at USSSA, Plaintiff Wegman became a whistleblower under USSSA's formal Whistleblower Policy.  In response to this potential threat, Defendant DeDonatis, with the assistance and support of the other Defendants, terminated Plaintiff Wegman to retaliate against and silence him, as part of a long-running pattern to enforce a toxic culture of silence and retaliation at USSSA.

7.    Plaintiff Thomas Horrom is a resident of the State of Michigan.  He began his career at USSSA in January 2019 as a consultant to the information technology department.  Seven months later, in August 2019, USSSA hired Plaintiff Horrom as Senior Director of Software Development.  In March 2021, USSSA requested Plaintiff Horrom to serve as the Interim Vice President of Information Technology because of health issues being experienced by the individual in that role.  In July 2021, USSSA hired Plaintiff Horrom as the permanent Vice President of Information Technology.  In December 2021, Plaintiff Horrom received another promotion to serve as Vice President of Technology and Advanced Media.

8.    In December 2022 and January 2023, Plaintiff Horrom submitted anonymous reports to USSSA outlining Defendant DeDonatis and Defendant Hornbacher's involvement in illegal bookmaking and sports gambling activities in violation of federal and Florida state criminal laws.  Following that whistleblower

submission, Defendants DeDonatis, Fortuna, Anderson, and Hornbacher learned or suspected that Plaintiff Horrom was the anonymous whistleblower.

9.      Instead of launching an internal investigation of these serious criminal allegations raised by Plaintiff Horrom, Defendants DeDonatis, Fortuna, and Anderson worked together to terminate Plaintiff Horrom and restrict Plaintiff Horrom's ability to disclose further information concerning illegal activities at USSSA with anyone outside USSSA, including law enforcement, government regulators, and external third parties.  Defendant DeDonatis illegally terminated Plaintiff Horrom on February 1, 2023.

10.     Defendant United States Specialty Sports Association, Inc. is a 501(c)(4) Not-for-Profit corporation headquartered in Melbourne, Florida (hereinafter referred to as "USSSA").  USSSA was founded in 1968 in Petersburg, Virginia.  In 2017, USSSA moved to its current headquarters in Melbourne, Florida.

11.     USSSA is the world's largest multi-sport athletic organization and has more than 4 million participants competing across multiple nationally sanctioned sports, including baseball, fastpitch and slowpitch softball, basketball, golf, and lacrosse.  USSSA maintains a network of more than 3,500 directors who oversee USSSA-sanctioned sporting events and provides support for USSSA athletes and participants.  *USSSA Employee Handbook, Section 1.1 History.*

12.     USSSA generates revenue from sanctioned and hosted events that operate (i) under the supervision of USSSA Directors, who are independent contractors and are not employees of USSSA, or (ii) by employees of USSSA. *USSSA By-Laws, Article II, Section 3.*  USSSA generates approximately $20 million in revenues each year.

13.     USSSA revenues derive from five principal sources: (1) membership registration fees for teams to join leagues and events sanctioned by USSSA; (2) specific event fees and sanctioned-event fees paid by USSSA Directors; (3) sales of insurance products to teams for facilities, player accident, and general liability (earned through referral fees that are included in insurance premiums); (4) sponsorship (e.g. by companies with access to member data and marketing products) and license royalty payments (e.g., bat, ball, gloves, apparel, and awards); and (5) event income generated from USSSA-sponsored events, principally at the Space Coast Complex in Brevard County, Florida (e.g., participant fees, livestream, and gate/ticket fees).  USSSA also owns Florida Pride, Inc. ("Florida Pride"), a professional women's fastpitch softball team, which plays its home games at the Space Coast Complex.  USSSA, through various for-profit and not-for-profit entities, leases from Brevard County and operates The Space Coast Complex, which

consists of the Space Coast Stadium, 15 separate AstroTurf fields, 15 scoreboards, three high-definition video boards, and advanced broadcast capabilities.[2]

14.    USSSA is governed by a Board of Directors, which is responsible for issuing Directives, Procedures, and Policies. *USSSA By-Laws, Article III, Section 1(d)*.  The USSSA chief executive officer operates under written procedures and policies. *USSSA By-Laws, Article III, Section 1(d)*.  According to the By-Laws, USSSA's purpose is to act as a "multi-sport, sanctioning (i.e., creating, managing, promoting and organizing) body for various recreational and competitive sports programs and other related events." *Article II, Section 2.*

15.    <u>Defendant Donald DeDonatis III</u> is a resident of Florida (hereinafter "Defendant DeDonatis").  USSSA appointed Defendant DeDonatis to acting Chief Executive Officer in January 2018, ultimately hiring him as permanent Chief Executive Officer effective January 1, 2019.  Prior to assuming that position, Defendant DeDonatis served as an Assistant Executive Director and Board Member of USSSA, as well as the Director of USSSA's operations in the State of Michigan. For over twenty-five years, Defendant DeDonatis's father, Donald DeDonatis II, served as the Executive Director, Chief Executive Officer, and Chief Financial

---

[2] The Space Coast Complex is owned by Brevard County, but managed and operated by USSSA's for-profit subsidiary, Florida Sports Management Group, Inc. ("FSMG"), which is responsible for the day-to-day management of the Space Coast Complex.

Officer of USSSA.  Donald DeDonatis II retired in January 2018 and was succeeded by his son Defendant DeDonatis.

16.    Defendant DeDonatis's tenure as Chief Executive Officer has been plagued by illegal activity and other misconduct, including bookmaking and sports gambling, diversion and use of USSSA funds for personal use, illegal drug use, and other activities.  To protect his control of USSSA and prevent reporting of his illegal and improper activities, Defendant DeDonatis has fostered a culture of silence, intimidation, and retaliation, with the aid of the remaining Defendants.

17.    Defendant DeDonatis violated 18 U.S.C. §§ 1962(c) and (d), and Florida State law, by actively participating in the named RICO scheme to engage in illegal bookmaking and gambling, mail and wire fraud, defrauding the Internal Revenue Service ("IRS"), possession of illegal drugs, and by attempting to silence Plaintiffs and prevent them from exposing Defendants' RICO activities and Florida State law violations as set forth herein.

18.    Defendant Richard ("Rick") Fortuna has served as the USSSA Chairman of the Board since 2018 (hereinafter "Defendant Fortuna").  Defendant Fortuna began his career at USSSA in 1998, helping to expand USSSA's portfolio of sports to include Youth Baseball.  Since 2004, Defendant Fortuna has served as the USSSA Director for the State of Kansas.

19.    Defendant Fortuna has worked closely with Defendant DeDonatis and Defendant Anderson, USSSA's General Counsel & Ethics and Compliance Officer, to protect Defendant DeDonatis's leadership of USSSA, despite Defendant Fortuna's awareness and intimate knowledge of Defendant DeDonatis's illegal and inappropriate activities as set forth in greater detail herein.  Defendant Fortuna acted contrary to his specific statutory and fiduciary duties and instead frequently protected fellow Defendants from accountability at the expense of the proper governance and operation of USSSA in compliance with applicable law.

20.    Defendant Fortuna violated 18 U.S.C. §§ 1962(c) and (d), and Florida State law, by actively participating in the named RICO scheme to engage in illegal bookmaking and gambling, mail and wire fraud, defrauding the Internal Revenue Service ("IRS"), possession of illegal drugs, and by attempting to silence Plaintiffs and prevent them from exposing Defendants' RICO activities and Florida State law violations as set forth herein.

21.    Defendant Wendy Anderson is USSSA's General Counsel and Ethics and Compliance Officer (hereinafter "Defendant Anderson").  She began her career at USSSA in 2018.  Two years later, in 2020, USSSA appointed Defendant Anderson as the company's Ethics and Compliance Officer, pursuant to USSSA's adoption of a formal Whistleblower Policy.

22.     Contrary to her statutory and fiduciary obligations and specific role as the Ethics and Compliance Officer, Defendant Anderson actively assisted Defendant DeDonatis and Defendant Fortuna in suppressing internal complaints of misconduct at USSSA, as well as helping to terminate Board Members, executive management, and staff who reported misconduct in good faith.  Furthermore, Defendant Anderson, actively assisted the Defendants to foster a culture of silence and retaliation in violation of her statutory and fiduciary duties and ethical responsibilities.

23.     Defendant Anderson violated 18 U.S.C. §§ 1962(c) and (d), and Florida State law, by actively participating in the named RICO scheme to engage in illegal bookmaking and gambling, mail and wire fraud, defrauding the Internal Revenue Service ("IRS"), possession of illegal drugs, and by attempting to silence Plaintiffs and prevent them from exposing Defendants' RICO activities and Florida State law violations as set forth herein.

24.     <u>Defendant Courtney Ceo</u> is Defendant DeDonatis's long-time paramour (hereinafter "Defendant Ceo").[3]  Defendant Ceo joined USSSA in 2018 as the National Program Director of Fastpitch.   Defendant Ceo and Defendant DeDonatis began their romantic relationship sometime before 2018.  Defendant Ceo leveraged her prized position as Defendant DeDonatis's paramour to attain influence and authority, as well as her current senior position at USSSA.  In 2021, Defendant

---

[3] Defendant DeDonatis is married and has two children.

DeDonatis promoted Defendant Ceo to Director of Brand Management and Business Strategy, despite her lack of experience, qualifications, and expertise in this area. Two years later, in 2023, Defendant DeDonatis promoted Defendant Ceo to Vice President of Brand Management and Business Strategy.

25.    Defendant Ceo violated 18 U.S.C. §§ 1962(c) and (d), and Florida State law, by actively participating in the named RICO scheme to engage in illegal bookmaking and gambling, mail and wire fraud, defrauding the Internal Revenue Service ("IRS"), possession of illegal drugs, and by attempting to silence Plaintiffs and prevent them from exposing Defendants' RICO activities and Florida State law violations as set forth herein.

26.    Defendant Jacob ("Jake") Hornbacher is Defendant DeDonatis's cousin and serves as USSSA's National Program Director and State Director for Michigan (hereinafter "Defendant Hornbacher").    When Defendant DeDonatis became USSSA's Chief Executive Officer in 2018, Defendant DeDonatis promoted Defendant Hornbacher to serve as his replacement for the State Director of Michigan.    In August 2021, Defendant DeDonatis hired Defendant Hornbacher to serve as USSSA National Program Director, based at USSSA's Melbourne, Florida headquarters.    Defendant Hornbacher continued to serve as State Director for Michigan.    Working together, Defendant DeDonatis and Defendant Hornbacher operated an illegal bookmaking and sports gambling operation in violation of federal

and Florida State laws, while working at USSSA, through the website AnySport247.com.

27.    Defendant Hornbacher violated 18 U.S.C. §§ 1962(c) and (d), and Florida State law, by actively participating in the named RICO scheme to engage in illegal bookmaking and gambling, mail and wire fraud, defrauding the Internal Revenue Service ("IRS"), possession of illegal drugs, and by attempting to silence Plaintiffs and prevent them from exposing Defendants' RICO activities and Florida State law violations as set forth herein.

### III. INTRODUCTION

28.    On February 1, 2023, and July 7, 2023, respectively, Plaintiff Horrom and Plaintiff Wegman were terminated from USSSA by Defendant DeDonatis, with the assistance and support of Defendant Fortuna and Defendant Anderson, as part of a pattern and long-standing practice at USSSA to silence and retaliate against Board Members, senior management, and staff from disclosing credible information concerning the individual Defendants' involvement in illegal and improper activities at USSSA.  In addition, by terminating Plaintiff Wegman and Plaintiff Horrom, Defendants DeDonatis, Fortuna, and Anderson breached Plaintiff Wegman's written Employment Agreement dated January 1, 2022, and Plaintiff Horrom's oral employment contract, respectively.

29.    Throughout their time at USSSA, Plaintiffs Wegman and Horrom were successful, high-performing executives and well respected within the company. Each of the Plaintiffs made significant contributions to USSSA.  In the face of serious wrongdoing, illegal activity, and other inappropriate conduct committed by the individual Defendants, Plaintiff Wegman and Plaintiff Horrom independently decided to raise their respective concerns about the illegal activity and misconduct at USSSA.

## IV. PLAINTIFF WEGMAN'S SUCCESSFUL CAREER AND ACCOMPLISHMENTS AT USSSA

30.    Plaintiff Wegman was a long-time friend and professional colleague of Defendant DeDonatis.  Plaintiff Wegman began his career at USSSA beginning in 2014, and continued until Defendant DeDonatis illegally terminated him on July 7, 2023.  Plaintiff was a dedicated and effective Chief Operating Officer who advanced the growth and development of the USSSA as a premier, non-profit association dedicated to the delivery of high-quality youth and adult sports leagues and events. Plaintiff's career path at the USSSA over a ten-year period reflected his superior performance and accomplishments, starting as a temporary contractor in 2014, all the way to eventually becoming the Chief Operating Officer of USSSA.

31.    On January 1, 2022, USSSA renewed Plaintiff Wegman's contract to serve as the Chief Operating Officer for a three-year term, at a salary of $306,375

per year (his "Employment Agreement").[4] *See Exhibit 1.*  At the end of 2022, in recognition of his superior performance, USSSA paid Plaintiff Wegman a bonus of $150,000 and his salary was increased to $329,353.

## V. PLAINTIFF HORROM'S SUCCESSFUL CAREER AND ACCOMPLISHMENTS AT USSSA

32.    Under Plaintiff Horrom's leadership, USSSA's information technology system was updated to meet USSSA's growing needs and ensure effective internal and external operations.[5]  Plaintiff Horrom received consistent exceptional ratings while working at USSSA.  For his first two years, the period 2019 to 2021, USSSA rated Plaintiff Horrom as a high-level performer.[6]  Defendant DeDonatis conducted Plaintiff Horrom's 2021 Performance Review, which was positive, with ratings for four specific elements between "4 (Exceeds Expectations)" and "5 (Outstanding)." In December 2021, USSSA promoted Plaintiff Horrom again to Vice President of

---

[4] Plaintiff Wegman's salary and bonus was set at a level equal to 60 to 75 percent of Defendant DeDonatis's salary and bonus.

[5] Defendant DeDonatis reduced Plaintiff Horrom's annual bonus from $21,000 to $8,000 for the years 2021 and 2022.  Defendant DeDonatis incorrectly alleged that Plaintiff Horrom erred in the rollout of a specific project.  In a meeting with Defendant DeDonatis and Plaintiff Wegman, Plaintiff Horrom refuted the allegations based on specific documentation Plaintiff Horrom produced at the meeting.  Defendant DeDonatis withdrew his unsupported allegations.

[6] For the period January to July 2019, Plaintiff Horrom was paid a monthly salary of $7,000. USSSA then paid Plaintiff Horrom a salary of $69,000 for the period August to December 2019 and an annual salary of $140,000 for the year 2020.

Technology and Advanced Media and appointed him to USSSA's executive management team.[7]

33.    On numerous occasions, Defendant DeDonatis specifically told Plaintiff Horrom that USSSA intended to execute a written employment agreement with Plaintiff Horrom confirming his appointment to an executive position. Defendant DeDonatis and Plaintiff Horrom discussed executing a written employment agreement in an annual salary range at a minimum of between $220,000 to $250,000 with an annual bonus.  Defendant DeDonatis repeatedly promised to enter such a written agreement, but ultimately failed to do so, before he decided to terminate Plaintiff Horrom in retaliation for filing a whistleblower report.

## VI. OVER A FIVE-YEAR PERIOD, THE DEFENDANTS ENGAGED IN ILLEGAL AND IMPROPER ACTIVITIES THAT JEOPARDIZED USSSA'S MISSION

34.    Defendant DeDonatis has continuously exploited USSSA for his personal financial benefit and for the benefit of a close circle of USSSA officials and employees.  He often hired, retained, promoted, and protected individuals whom he believed would aid and enable him to control the organization and further his own private interests.  As a result of these actions, assets and funds were diverted, wasted,

---

[7] For the time period for year 2021 through 2023, USSSA paid Plaintiff Horrom: (a) an annual salary of $165,000 for the year 2021; (b) an annual bonus for 2021 of $21,000; (c) an annual salary of $195,000 for the year 2022; and (d) an annual bonus for 2022 of $8,000.  Even after he was terminated, Plaintiff Horrom was hired as a consultant starting in March 2023 and was paid approximately $69,000 in consulting fees.

and improperly used to benefit Defendant DeDonatis, Defendant Fortuna, Defendant Anderson, his paramour Defendant Ceo, and his cousin Defendant Hornbacher. Furthermore, Defendants were able to engage in various illegal activities outlined herein, including running an illegal bookmaking and sports gambling operation. Anyone who threatened these interests were subject to retaliation, including a hostile work environment, diminished opportunities and compensation, and, more often than not, termination from USSSA. This toxic culture and repeated retaliatory actions had a chilling effect on any employee who considered raising their concerns about the Defendants' illegal and improper activities at USSSA.

35. In an attempt to correct the toxic and corrosive culture and an environment in which illegal and improper activities regularly occurred, Plaintiff Wegman and Plaintiff Horrom decided to internally raise their respective concerns. In response, the Defendants retaliated against the Plaintiffs and illegally terminated them because each had extensive knowledge concerning the Defendants' participation in and execution of illegal and improper conduct, including but not limited to:

(1) Defendant DeDonatis and Defendant Hornbacher's illegal bookmaking and sports gambling activities in violation of federal and state law, and failure to initiate an independent internal investigation in response to

16

whitleblower allegations concerning such illegal and improper activity;

(2)     Numerous retaliatory terminations against USSSA Board Members, executives, and employees, some of whom were designated or otherwise qualified as whistleblowers, in order to enforce a culture of silence, retaliation, and fear of reprisal;

(3)     Defendant DeDonatis's illegal use and diversion of USSSA funds for personal benefits, including stays at hotels, lavish meals, travel to resorts, gifts for Defendant Ceo, and other personal financial benefits;

(4)     Improper and illegal financial accounting practices designed to present favorable financial results to the USSSA Board of Directors, and avoid scrutiny of USSSA's financial activities and books and records;

(5)     Granting of an illegal loan for $1.033 million from the USSSA Board of Directors to Defendant DeDonatis, despite specific knowledge that the loan was illegal under federal and Florida State law;

(6)     Defendant DeDonatis's illegal surveillance and recording of USSSA employees' communications in violation of federal and state law as a means to proactively uncover potential whistleblowers who might raise concerns about Defendant DeDonatis's illegal and improper activities, and silence and retaliate against them before they could reveal such;

17

(7)     Defendant DeDonatis's illegal drug use in violation of federal and state law, and the USSSA Board's failure to pursue allegations raised by whistleblowers concerning Defendant DeDonatis's illegal drug use and erratic and volatile behavior; and

(8)     Creation of a toxic culture of silence and fear by retaliating against Board Members, senior executives, and employees, while promoting favoritism of Defendant DeDonatis's long-time paramour, Defendant Ceo, and the other Defendants who were loyal to Defendant DeDonatis.

36.     A more detailed description of the Defendants' illegal and improper activities over the time period of 2018 to July 2023 is summarized and set forth below.

**A.     <u>Defendant DeDonatis's Illegal Bookmaking and Sports Gambling Activities</u>**

37.     Beginning in or about sometime around 2014 and continuing into 2023, Defendant DeDonatis has been operating an illegal bookmaking and sports gambling business.  Prior to assuming his position as USSSA's Chief Executive Officer, while serving as an Assistant Executive Director, Board Member, and State Director of Michigan, Defendant DeDonatis ran an illegal bookmaking and sports gambling business with clients located in a variety of states.  Defendant DeDonatis delegated the day-to-day management of his illegal bookmaking and sports gambling business to Defendant Hornbacher, his cousin, who replaced Defendant DeDonatis as the

USSSA State Director for the State of Michigan.  Working together, Defendant DeDonatis and Defendant Hornbacher ran this illegal operation through an offshore website, AnySport247.com.  Defendants DeDonatis and Hornbacher themselves used the site to track their own bets, and ultimately built and operated a sizable illegal bookmaking and sports betting business.

38.    After his appointment as Chief Executive Officer at USSSA, Defendant DeDonatis and Defendant Hornbacher continued their illegal bookmaking and sports gambling business in violation of both federal and Florida State law.  Defendant DeDonatis and Defendant Hornbacher utilized the AnySport247.com website to create and manage illegal gambling accounts. The Defendants received bets and wagers from various individuals related to specific sporting events according to the odds and point spreads available on AnySport247.com.

39.    Defendants DeDonatis and Hornbacher collected and distributed large amounts of cash to and from their betting clients, and at times utilized USSSA staff and facilities for this operation.  Defendant DeDonatis and Defendant Hornbacher often received single wagers of greater than $1,500.  On one occasion, Defendant DeDonatis directed Employee-1 to pick up an envelope filled with cash from individuals in an automobile outside of USSSA's offices, believed to be related to this bookmaking and sports gambling operation.

**B.**    **Defendant DeDonatis's Misuse and Abuse Use of USSSA Funds for Personal Benefits, Travel, Resort Stays, and Gifts**

40.    Beginning at least sometime in 2018, Defendant DeDonatis regularly used USSSA funds to pay for personal expenses, rather than for the organization's purpose of promoting high-quality adult and youth sports programs, leagues, and events.  His misuse of funds includes, for example, paying for lavish dinners at high class restaurants, travel and hotel expenses for amorous rendezvous with Defendant Ceo, gas for his personal vehicle, and Christmas gifts and flowers for Defendant Ceo.  In all these instances, Defendant DeDonatis violated federal and state laws governing fraud and proper use of funds by not-for-profit corporations, in addition to USSSA internal policies and procedures.

41.    Under Title 26 U.S.C § 501(a) and (c)(4)(B), as a social welfare organization, USSSA is entitled to tax exempt status on the condition that "no part of the net earnings of such entity inures to the benefit of any private shareholder or individual."[8]  "The term 'no part' is absolute. The organization loses tax exempt status if even a small percentage of income is lent to a private individual." *Church of Scientology v. Commissioner*, 823 F.2d 1310, 1316 (9th Cir.1987); *see also Article*

---

[8] *See also* Treas. Reg. § 1.501 (c)(3)-1 (c)(2).

*IV, Articles of Organization of USSSA, LLC* ("No part of the net earnings of the Company shall inure to the benefit of any private person . . .").[9]

42.    A nonprofit entity is ordinarily understood to differ from a for-profit corporation principally because it is "'barred from distributing its net earnings, if any, to individuals who exercise control over it, such as members, officers, directors, or trustees.'" *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 585, 117 S. Ct. 1590, 1603 (1997); *see also Church of Scientology v. Commissioner*, 823 F.2d 1316 ("[c]ourts have construed broadly the term 'net earnings' [which] includes more than gross receipts minus disbursements as shown on the books of the organization.").

43.    The prohibition on non-profit corporation inurement is intended to exclude any element of personal gain, and to ensure that tax-exempt entities adhere to a strict prohibition against personal gain.[10]

---

[9] In addition, federal tax law explicitly prohibits self-dealing, including the lending of money and extension of credit terms.  *See* 26 U.S.C. §4941(d)(1)(B).

[10] Inurement cases frequently involve insiders, such as a Chief Executive Officer, who use exempt entity funds for personal purchases categorized as an "incorporated pocketbook," leading to courts striking down the exempt status of such entities. *See e.g. Church of Scientology v. Commissioner*, 823 F.2d 1316 (9th Cir. 1987) (holding, where millions of dollars in church assets were transferred to former executive under false pretense of debt repayment, "[u]naccounted for diversions of a charitable organization's resources by one who has complete and unfettered control can constitute inurement.")*; W. Catholic Church v. Commissioner,* 73 T.C. 196, 214 (1979) (stating that "[exempt organization] was utilized by [insider] as an 'incorporated pocketbook . . ..'"); *Labrenz Found., Inc v. Commissioner, Docket No. 5175-73*, 1974 Tax Ct. Memo LEXIS 23, at* 20-21 (T.C. Nov. 26, 1974) (stating that "[i]n a very real sense, [insider] used [exempt organization] as a kind of 'incorporated pocketbook.'").

44.    Defendant DeDonatis, frequently with the aid of Defendant Ceo, systematically looted USSSA for his own personal benefit.  His egregious private use and "inurement" of USSSA funds jeopardized USSSA's tax-exempt status and raises significant risk of federal tax enforcement and collateral litigation.

45.    Set forth below are some examples of Defendant DeDonatis's misuse of USSSA funds:

- In January 2020, Defendant DeDonatis planned to attend the American Baseball Coaches Association Annual ("ABCA") meeting in Nashville, Tennessee, and to have Defendant Ceo accompany him despite the fact that her job responsibilities related solely to fastpitch softball and not baseball leagues and events.  Defendant DeDonatis directed Employee-1 to purchase the tickets to attend the ABCA meeting and flights to Nashville in order to make sure Defendant DeDonatis's wife and others at USSSA were not aware of the arrangement.

- Defendant DeDonatis regularly had Employee-1 book him a room at nearby hotels without fully explaining why they were needed.  USSSA staff and members believed that Defendant DeDonatis used these rooms for romantic rendezvous with Defendant Ceo.

- In December 2020, Defendant DeDonatis directed Employee-1 to use USSSA funds to purchase Christmas gifts for Defendant Ceo, which caused an

argument between Defendant DeDonatis and Defendant Ceo. Defendant DeDonatis requested that Employee-1 lie to Defendant Ceo about who purchased the gifts.

- On February 15, 2022, Defendant DeDonatis, using the USSSA credit card, purchased flowers for Defendant Ceo with an accompanying message: "Happy Valentine's Day! Through all of the craziness and moving parts in the last year one thing stayed consistent and that is my true love for you! Love, BDD:)."

- In August 2022, Defendant DeDonatis used the USSSA credit card to charge $2,600 in expenses related to a weekend at the Ritz Carlton in Orlando, Florida. USSSA's Controller categorized this expenditure as an USSSA expense even though there was no known USSSA purpose for the trip.

- In September 2022, Defendants DeDonatis and Ceo traveled to Las Vegas for pleasure and charged the expenses to the USSSA credit card, including their stay at the Mirage Essentials Hotel and $1,500 for dinner at Emeril's New Orleans restaurant.

- On March 22, 2023, Defendant DeDonatis took his family to the Breaker's Hotel in Palm Beach, Florida for a family vacation and charged nearly $9,800 to the USSSA credit card. After USSSA's Controller raised an objection to Defendant DeDonatis's improper use of the USSSA credit card for his family

vacation, Defendant DeDonatis provided a check to the Controller to reimburse USSSA for the expenses incurred.

- On June 2, 2023, Defendants DeDonatis and Ceo attended a USSSA FastPitch All American Games tryout in Choctaw, Oklahoma.  Defendants DeDonatis and Ceo traveled to Dallas, Texas before and after the event.  On their first night in Dallas, they spent $1,957 for dinner at Nick and Sam's Steakhouse, and when they returned to Dallas, they enjoyed a dinner at The Monarch Restaurant for $2,200, all charged to the USSSA credit card.

## C.    **Defendant DeDonatis Diverted USSSA Funds and Engaged in Financial Reporting Manipulation to Benefit Himself and Frustrate Board of Directors Oversight of USSSA's Financial Activities**

46.    In a number of situations, Defendant DeDonatis took steps to divert USSSA funds for his own benefit, manipulate USSSA's financial records, and doctor USSSA's books and records in order to ensure favorable financial reports and to prevent USSSA Board oversight and questions concerning certain USSSA programs, financial budgets, and program-specific revenue reporting.

### 1. *Diversion of Skills Competition Revenues*

47.    Several USSSA-sponsored national events offer participants opportunities to compete in Skills Competitions, (e.g. Home Run Derby, Best Arm, Fastest Runner), for which USSSA charges between $10 to $25 per participant in each competition.  In the summer of 2021, USSSA financial staff uncovered

discrepancies in the collection, booking, and recording of cash revenues from such competitions.

48.    According to USSSA financial staff, the Skills Competitions revenues were not reported in USSSA's Profit and Loss report for the event, were never discussed with USSSA's finance staff, and no deposits of funds collected from these events were ever made to USSSA's bank accounts.

49.    Following this discovery, USSSA staff raised questions with Plaintiff Wegman and others concerning the location of these funds.  USSSA staff were concerned that Defendant DeDonatis and Defendant Hornbacher were diverting funds for their own use and joint benefit, as the two often referred to these cash payments as part of "their slush fund."

50.    The next year, in 2022, financial documents from the Skills Competitions linked to each USSSA-sponsored national event indicated that payments for such competitions were sent to a non-USSSA bank account, which Plaintiff Wegman believed was established for the personal benefit of Defendant DeDonatis, Defendant Hornbacher, and Employee-6.

51.    For each event, the revenue collected would usually total between $12,000 and $15,000, and USSSA typically conducted between four to six Skills Competitions each year.    Assuming the low-end estimate for each Skills Competition, Defendants DeDonatis and Hornbacher illegally diverted

approximately $48,000 in each of 2021 and 2022 to the non-USSSA bank account. These revenues were not entered into USSSA's financial books and records in violation of USSSA's financial controls and requirement to maintain accurate books and records.

### 2. *Diversion of National Event Revenues: Firecracker and Global World Series*

52.    In July 2022, Plaintiff Wegman learned that Defendant DeDonatis was shifting financial revenue from USSSA for two annual USSSA national events at the Space Coast Complex – the Space Coast Global World Series and the Firecracker World Series – to a non-USSSA bank account that may have been linked to Employee-6.  Upon information and belief, Plaintiff Wegman and other USSSA financial staff suspected that Defendant DeDonatis had reached an understanding with Employee-6 to divert such revenues off USSSA's books and records.

53.    In 2022, at Defendant DeDonatis's direction, USSSA staff sent $126,160 in entry fees for the Firecracker World Series, and $69,075 in entry fees for the Global World Series, to the same non-USSSA bank account.  In accordance with proper accounting procedures, and given that these were USSSA events held at the Space Coast Complex, these 2022 revenues should have been collected by USSSA and recorded on its books.

54.    At a meeting on August 16, 2022, which was held just before the August 2022 USSSA Board Meeting, Defendant DeDonatis agreed to restore the

26

previous years' revenue reporting and collection practice, as was followed in 2021, for the Firecracker World Series and Global World Series events.

55.    Later in 2023, Defendant DeDonatis reneged on his prior decision to properly record and collect the Firecracker World Series and Global World Series entry fees on USSSA's books.  Instead, Defendant DeDonatis directed that entry fees for these two events should not be collected and deposited for USSSA but that the entry fees for these two events should be sent to a non-USSSA bank account.  In addition, Defendant DeDonatis instructed the staff not to collect any USSSA sanction fees that are normally charged for a USSSA-sanctioned event for the Panama City Global World Series, presumably to increase the revenue earned by the beneficiary of the specific event.

56.    At Defendant DeDonatis's direction, in 2023, USSSA staff sent $99,885 in entry fees for the Firecracker World Series and $67,095 in entry fees for the Global World Series to the same non-USSSA bank account.  In addition, at Defendant DeDonatis's instruction, USSSA staff did not collect approximately $25,900 in USSSA sanction fees for the Panama City Global World Series. Ultimately, these fees were not collected and recorded in USSSA's books and records.

### 3. *Movement of 2022 Florida Pride Expenses to USSSA Books and Records*

57.    On August 25, 2022, Defendant DeDonatis participated in a telephone conference to review the profit and loss report for Florida Pride, Inc., in preparation for the 3rd Quarter USSSA Board Meeting.    After expressing anger and dissatisfaction about certain entries on Florida Pride's books, Defendant DeDonatis directed his staff to remove approximately $55,000 in expenses from the Florida Pride books and records and move them to USSSA, LLC's books and records. Specifically, on October 31, 2022, Defendant DeDonatis directed staff to remove expenses for uniforms, player cards, and laundry from the Florida Pride financial report in order to mislead and present a more favorable financial report to the USSSA Board of Directors at the upcoming National Convention Board of Directors Board Meeting.

### 4. *Reassignment of 2023 Expenses to Prior Year Financial Reports*

58.    In February 2023, Plaintiff Wegman and Employee-1 raised a concern with Defendant DeDonatis concerning an invoice received from Withum Consulting in relation to a planned reorganization of USSSA.  Defendant DeDonatis instructed Plaintiff Wegman and Employee-1 to enter the expense for such services in USSSA's 2022 financial books rather than 2023 when the expense was actually incurred.

**D.    Three USSSA Board Members Raise Concerns About Defendant DeDonatis's Illegal and Improper Conduct**

59.    On April 23, 2020, Kevin Naegle, a Voting Member of the USSSA Board of Directors; Joey Odom, a Voting Member of the USSSA Board of Directors; and Billy E. Loftin, Jr., a former General Counsel and Nonvoting Member of the USSSA Board of Directors, (collectively referred to as "the Board Authors") filed a letter with Defendant Fortuna, the Chairman of the USSSA Board, "regarding our growing concerns related to [Defendant DeDonatis]." *See Exhibit 2*.

60.    The Board Authors initially requested that the issues relating to Defendant DeDonatis be handled discreetly but "face[d] opposition on all fronts." The Board Authors noted that the source(s) for these issues were "employees, directors, vendors, sponsors and non USSSA individuals."   The Board Authors requested that the USSSA Board of Directors engage an independent investigator to review these issues.  The specific issues concerning Defendant DeDonatis included six separate items:

> (1) Relationship with [Defendant Ceo];
> (2) Inappropriate payments of funds to [Defendant Ceo] where the true nature of the payments are intentionally disguised by [Defendant DeDonatis] himself involving at least two (2) other employees other than himself and [Defendant Ceo];
> (3) Recreational use of illegal drugs and potential continued use of steroids;
> (4) Improper management and poor decision making related to the overall well-being of the organization and the staff;
> (5) Failure to pay Michigan State director fees, and

(6) Failure to repay or attempt to make arrangements to repay all of the improper loans, where the only plan seems to be continued extensions with no reasonable explanation, proposal or basis for same.

61.    The USSSA Board of Directors specifically acknowledged the receipt of the Board Author's request under the USSSA Whistleblower Policy.  At the USSSA Board Meeting on April 23, 2020, the Board voted 2-2 (unsurprisingly, Defendant Fortuna opposed) and did not agree to a motion to have Defendant DeDonatis undergo a drug test as requested by the Board Authors.

62.    Two days later, on April 25, 2020, Mr. Loftin submitted a supplement to the initial complaint with additional details relating to several of the allegations. In this supplement, Mr. Loftin noted his concern over Defendant Anderson's unwillingness to investigate the allegations unless the Board Authors disclosed the identities of their information sources, contrary to USSSA's Whistleblower Policy. The Board Authors refused to disclose the identities of the whistleblowers and witnesses.

63.    Rather than responsibly considering the Board Authors' allegations, Defendants DeDonatis, Fortuna, and Anderson took steps to have the USSSA Board Members removed in order to retaliate against and silence them from raising these and other concerns as to Defendant DeDonatis's leadership and improper conduct at USSSA.  Defendants Fortuna and Anderson knew that several of the allegations

were in fact accurate and warranted further investigation in accordance with their respective statutory and fiduciary obligations and duties owed to USSSA.[11]

### E.    USSSA Board's Illegal Loan to Defendant DeDonatis for Over $1 Million

64.    The Board Authors also alleged that the USSSA Board improperly granted two loans to Defendant DeDonatis to purchase property and construct a new home in Melbourne, Florida.  In addition, the Board Authors complained that the USSSA Board improperly extended repayment terms of the loans.

65.    On January 5, 2016, the USSSA Board of Directors approved the grant of two loans to Defendant DeDonatis: (1) a short-term loan for not more than 15 years at market rate for $225,000 "as he is being considered for the future CEO position" and (2) an "80 percent housing loan not to exceed $800,000 for the purchase of [a] home in Brevard [County]."  At the time, Defendant DeDonatis was an Assistant Executive Director, Michigan State Director, and USSSA Board Member.  USSSA did not report the loan to Defendant DeDonatis in its 2016 Annual

---

[11] Eventually, Defendants DeDonatis, Fortuna, and Anderson were able to suppress any review or consideration of the investigation, and specifically entered into a "settlement" with Joey Odom to resign as a USSSA Board Member in exchange for his engagement as a consultant and USSSA's agreement to fund his retirement.  In total, USSSA agreed to pay Joey Odom $285,000 in consulting fees, and a separate amount of $1.025 million as payment for his "retirement."  Kevin Naegle and Billy Loftin resigned their positions as USSSA Board Members.

Form 990 filed with the Internal Revenue Service.[12]  At the time, the USSSA Board did not document the loans or any terms for repayment.

66.     Under Florida State law, USSSA's loans to Defendant DeDonatis violated Fla. Stat. Ann. § 617.0833 (2022), which prohibits the grant of such loans to a director or officer of a Florida not-for-profit corporation. Section 617.0833 provides:

> Loans to directors or officers. – Loans, other than through the purchase of bonds, debentures, or similar obligations of the type customarily sold in public offerings, or through ordinary deposit of funds in a bank, may not be made by a corporation to its directors or officers . . . A loan made in violation of this section is a violation of the duty to the corporation of the directors or officers authorizing it or participating in it.

67.     On October 11, 2018, Defendant Anderson prepared a legal opinion memorandum to the USSSA Board of Directors confirming that the two loans made to Defendant DeDonatis likely violated Florida law.

68.     It was not until 2020, and nearly two years after Defendant Anderson's legal memorandum dated October 2018, that the USSSA Board took steps to seek repayment of the illegal loans as a basic step to remediate their illegal actions.

---

[12] However, USSSA ultimately included these loans as approved by the Board of Directors in subsequent filings of its Annual Form 990 with the Internal Revenue Service.  USSSA filed forms in 2017 noting an original principal amount of $1,077,357 and a remaining balance of $1,053,365; in 2018 with an original principal amount of $1,053,365, and a remaining balance of $1,033,759; and in 2019 with an original principal amount of $1,033,759 and remaining balance of the same. USSSA did not report the two loans in 2022, presumably because Defendant DeDonatis repaid the loans.

Indeed, in April 2020, the Board of Directors took the unusual step, with Defendant Anderson's assistance, of creating two new and separate notes, titling them as "Amended and Restated Notes," both of which are undated, and reference an original Note, executed on April 1, 2017, one for $225,000, with a maturity date of April 28, 2020, and another for $800,000 with a maturity date of April 28, 2020. The two Amended and Restated Notes were executed by Defendant DeDonatis on April 28, 2020.

69.    By issuing the Amended and Restated notes in 2020, three years after the original illegal loans, Defendants DeDonatis, Anderson, and Fortuna repeated their clear violations of Florida State law Section 617.0833 prohibiting such loans.

70.    Furthermore, in addition to the clear violation of Florida law governing loans to not-for-profit directors and officers, Defendants DeDonatis, Anderson, and Fortuna violated Florida not-for-profit law and federal law, initially in 2016 and subsequently in 2020, that prohibits private inurement for the benefit of a director or officer such as Defendant DeDonatis.[13] *See* Fla. Stat. Ann. § 617.0832; *see also Orange Cty. Agric. Soc'y., Inc. v. Commissioner.*, 893 F.2d 529, 534 (2d Cir. 1990)

---

[13] At the May 4, 2020, USSSA Board Meeting, Defendant Fortuna explained that Defendant DeDonatis's loan "is coming due and he is in the process of obtaining a loan to pay it off in full; however, he needs an extension on the loan to work through the bank process and get his banking in order." Defendant Fortuna explained that the "maturity date needs to be extended to allow [Defendant DeDonatis] sufficient time to pay off the debt, which would solve a lot of problems for the organization." He stated that extension of the maturity date would eliminate interest owed by Defendant DeDonatis. Defendant Fortuna's motion to extend the maturity date by 90 days was defeated by a tie vote, 2-2.

("Courts have frequently held that loans extended on advantageous terms by an exempt organization to its founders or shareholders . . . indicate private inurement. . ."); *Article IV, Articles of Organization of USSSA, LLC* ("No part of the net earnings of the Company shall inure to the benefit of any private person . . .").[14]

### F.    USSSA's False Statements in Annual Form 990 Filings

71.    USSSA adopted two important policies at its September 17, 2019, Board of Directors Meeting: (1) the Conflict of Interest Policy and (2) the Whistleblower Protection Policy.  The two policies were incorporated into USSSA's Employment Manual as Policies Number 21 and 22, respectively.  Prior to that action, USSSA did not have a formal Conflicts of Interest policy.

72.    In its 2016, 2017, and 2018 Annual Form 990 filings to the Internal Revenue Service, USSSA falsely stated that it had adopted a written conflict of interest policy. *See 2016, 2017, and 2018 USSSA Form 990 Filings, Part VI, Section B, Question 12a.*

73.    Despite adopting a Whistleblower Protection Policy in September 2019, USSSA's Form 990 for 2019, 2020, and 2021 stated that USSSA did not have

---

[14] At a December 30, 2019, USSSA Board of Directors meeting, the Board Minutes reflect a discussion of the loans to Defendant DeDonatis, which resulted in the Board extending the date for repayment of the two outstanding loans from the end of 2019 to January 13, 2020, the date of the next Board meeting.

a written Whistleblower Policy. *See 2019, 2020 and 2021 USSSA Form 990 Filings, Part VI, Section B, Question 13.*

74.    Additionally, to the extent that USSSA's books and records were doctored for illegal inurement, diversion of funds, or theft of USSSA funds for personal use, as recounted above, USSSA's Form 990 filings and financial entries in the relevant years were inaccurate.  As such, USSSA and Defendant DeDonatis may be subject to potential criminal penalties for false statements. *See 18 U.S.C. 1001; 26 U.S.C. 7206.*

### G.    Defendant DeDonatis's Illegal Drug Use

75.    Over the course of his employment at USSSA, Board Members, executives, and staff suspected that Defendant DeDonatis used illegal drugs, namely, unprescribed Adderall and Trenbolone.[15]    Defendant DeDonatis's use of unprescribed Adderall and Trenbolone violated both Federal[16] and Florida law.[17]

76.    As noted above, in April 2020, three USSSA Board Members filed a whistleblower complaint alleging, *inter alia*, that Defendant DeDonatis used illegal

---

[15] Defendant DeDonatis's use of these illegal drugs violated USSSA's Drug Free Workplace Policy, *Section 3.6, Drug-Free Workplace and Exhibit 1 of USSSA.*

[16] Under Title 21 United States Code §844, it is unlawful to possess unprescribed Adderall, an amphetamine and Schedule II controlled substance.  Trenbolone is an anabolic steroid and listed as a Schedule III controlled substance. 21 U.S.C. §801. The illegal possession of these substances is a misdemeanor punishable by a term of imprisonment of not more than 1 year and shall be fined a minimum of $1000, or both.

[17] Under the *Florida Drug Abuse and Prevention Control Act*, possession of Adderall is prohibited as a Schedule II drug while Trenbolone is prohibited as a Schedule III drug, and punishable as a

drugs and should be subjected to a drug test.  Defendants Anderson and Fortuna coordinated together to oppose and prevent a drug test of Defendant DeDonatis, despite their knowledge of prior reports alleging that Defendant DeDonatis used illegal drugs while working at USSSA and attending USSSA events.

77.    In April 2022, while discussing Defendant DeDonatis's volatile behavior and suspected illegal drug use, Defendant Hornbacher told Plaintiff Wegman that Defendant DeDonatis was taking Trenbolone, an illegal anabolic steroid which causes severe mood swings and aggressive behavior.

**H.    Illegal Surveillance Activities at USSSA and Whistleblower Retaliation**

78.    To maintain control of USSSA and to prevent any employee from reporting Defendant DeDonatis's illegal and improper activities, Defendant DeDonatis engaged in illegal and non-consensual surveillance of USSSA employees.  Most egregiously, in or around 2018 to 2019, Defendant DeDonatis placed a voice recording device in the private office of Employee-3, a USSSA executive, who Defendant DeDonatis knew had provided information to the Board Members as part of the April 2020 request to investigate Defendant DeDonatis's illegal and improper activities.  Defendant DeDonatis was concerned that Employee- 3 would continue his/her efforts to raise concerns against Defendant

---

third-degree felony, up to five (5) years in prison and a fine of up to $5000.  *Fla. Stat. Ann §893.13.6(a)(2023).*

DeDonatis. This recording device continuously and indiscriminately recorded Employee-3's conversations, potentially including private conversations that had no relevance to the employee's responsibilities at USSSA.

79. Additionally, Defendant DeDonatis regularly monitored and reviewed records detailing employee use of USSSA-issued cell phones. Defendant DeDonatis had access to these records and often reviewed them to determine with whom USSSA employees were communicating.[18]

## I.    Defendant DeDonatis's Illicit Relationship with Defendant Ceo and It's Disastrous Impact on the USSSA Workplace

80. As noted above, Defendant DeDonatis and Defendant Ceo have maintained a long-term extramarital relationship, beginning sometime before January 2018 and continuing to at least July 2023. Defendant DeDonatis showered Defendant Ceo with favoritism and protection at USSSA, and advanced her career at USSA to an elevated position amongst her colleagues despite her lack of qualifications and to the detriment of the organization. Further, Defendant DeDonatis and Defendant Ceo frequently acted together to retaliate against and even terminate employees who disliked or questioned Defendant Ceo's decisions and

---

[18] Defendant DeDonatis actions violated the Florida Security of Communications Act ("FSCA"). The FSCA prohibits the intentional interception and disclosure of wire, oral, or electronic communications. Fla. Stat. § 934.03. Florida is considered a two-party consent state, where both parties to a conversation must consent to its recording. *See Jatar v. Lamaletto*, 758 So.2d 1167, 1169 (Fla. Dist. Ct. App. 2000); *Cohen Bros., LLC v. ME Corp. S.A.*, 872 So. 2d 321, 324 (Fla. Dist. Ct. App. 2004).

performance.  Defendant DeDonatis allowed Defendant Ceo other opportunities to exact petty revenge, such as her involvement in setting annual bonuses, where Defendant Ceo would request significant reductions for targeted employees. Furthermore, Defendants DeDonatis and Ceo frequently circumvented financial controls to use USSSA funds for private getaways, vacations, and other personal benefits, as discussed herein.  Over the course of a five-year period, Defendants DeDonatis and Ceo, acting together, fostered a toxic culture of silence and retaliation which hindered USSSA's ability to achieve its mission and objectives.

81.    Defendant DeDonatis was certainly aware of the cultural issues resulting from his favoritism of Defendant Ceo, but prioritized his own selfish desires over promoting USSSA's culture of ethics and compliance.  For example, on February 18, 2021, in one of many internal meetings on the topic, Plaintiff Wegman and Employee-1 met with Defendant DeDonatis to inform him that several USSSA employees were individually complaining about the impact his relationship with Defendant Ceo had on the organization.  Plaintiff Wegman and Employee-1 stated that they and other employees felt that Defendant Ceo was "untouchable" because of Defendant DeDonatis's favoritism and recurring intervention on her behalf.[19]

---

[19] The complications created by Defendant DeDonatis and Defendant Ceo's illicit relationship also extended to USSSA's relationship with external parties.

82.    The other Defendants turned a blind eye to the problems, or actively enabled them to continue.  For example, Employee-1 frequently requested to be transferred to alternative positions due to the constant stress and emotional toll of navigating Defendant DeDonatis and Defendant Ceo's complicated and often volatile relationship.  Defendants DeDonatis and Anderson rejected all of these requests.

83.    In another instance, Employee-5 resigned from USSSA citing Defendant Ceo's disagreeable disposition, her lack of experience and qualifications, and her circumvention of reporting lines in constantly seeking Defendant DeDonatis's intervention.  Employee-5 was offered a lucrative severance agreement that included robust general release and non-disparagement provisions to ensure that Employee-5 remained silent and did not report nor communicate Employee-5's concerns about Defendant Ceo.

84.    More seriously, in October 2021, Defendant Ceo demanded that Defendant DeDonatis promote her to serve as USSSA's Director of Brand Management and Business Strategy, a position for which she was unqualified and had no meaningful experience.  To effectuate this change, on November 23, 2021, Defendant DeDonatis terminated Paul O'Leary, USSSA Director of Marketing, after

an eleven-year career at USSSA.  O'Leary hired counsel to dispute the sudden termination.[20]

85.    USSSA, through Defendants DeDonatis, Anderson, and Fortuna, prepared O'Leary a severance package, which included robust non-disparagement clauses and legal releases, to ensure that O'Leary was silenced and legally barred from reporting the circumstances surrounding his termination.  In line with his consistent practice, Defendant Fortuna approved the settlement without notifying or even disclosing the matter to other USSSA Board Members.  On December 21, 2021, as planned, Defendant DeDonatis promoted Defendant Ceo to fill the vacant role.[21]

86.    Similarly, in April 2022, Defendant DeDonatis informed Plaintiff Wegman and Employee-1 that he wanted to terminate Nick Santana, USSSA's Operations Manager, much to their shock.  This decision was based on a lower-level employee's complaint against Santana, which, upon information and belief, was sent at Defendant Ceo's direction and encouragement.  After objecting, and noting

---

[20] In a letter dated December 6, 2021, O'Leary's counsel noted that O'Leary had not been informed as to the reasons for his termination, that Defendant DeDonatis did not show up at a scheduled meeting to discuss the termination, and that, over his eleven-year career at USSSA, O'Leary never received any indication of any negative performance issues.  O'Leary's counsel suggested that O'Leary was terminated solely because Defendant DeDonatis needed to award the position to Defendant Ceo.

[21] Defendant DeDonatis changed the title of O'Leary's former position to "Director of Brand Management and Business Strategy" in an attempt to disguise the obvious fact that Defendant DeDonatis fired O'Leary to award the position to Defendant Ceo, his long-time paramour.  USSSA staff were not fooled, and several employees voiced their concerns to Employee-1.

Santana's consistently positive performance reviews, Defendant DeDonatis angrily threatened to terminate Employee-1 for that opinion.

87.    On April 21, 2022, Defendant DeDonatis terminated Nick Santana. Santana hired counsel and alleged that he was fired solely because he had damning information concerning Defendant DeDonatis's illicit relationship with Defendant Ceo, and because Santana knew about Defendant DeDonatis's illegal and improper activities.   Once again, USSSA, through Defendants DeDonatis, Anderson, and Fortuna, prepared Santana a severance package that included robust non-disparagement and legal releases.   Defendant Fortuna, once again, approved the settlement without notifying or even disclosing the matter to other USSSA Board Members.

88.    Further, in February 2023, Employee-2 resigned, and in accordance with existing USSSA procedures, Mariah Castro, USSSA's Human Resources Manager, conducted an exit interview.   Employee-2 specifically complained that USSSA employees were reluctant to raise issues concerning Defendant Ceo's performance because Defendant DeDonatis would protect Defendant Ceo from any criticism or consequences.   Employees who raised such issues were often excluded or treated differently as punishment for raising such issues.   Following the interview, Defendants DeDonatis, with the help of Defendant Hornbacher, pressured Mariah

Castro to learn about the contents of Employee-2's exit interview. Castro refused, citing her promise to keep it confidential.

89.    On March 5, 2023, Employee-2 reported that Defendant Hornbacher called to ask questions about the exit interview. Shortly after this conversation, Defendant Hornbacher contacted Employee-2 again trying to request additional information. When Employee-2 refused to provide any information, Defendant Hornbacher reacted with anger and paranoia, stating that Employee-2 must be on "their side," and then claiming that "they" (referring to Plaintiff Wegman and Employee-1) were trying to take over USSSA and get "us" in trouble. Following the obvious pressure, Employee-2 subsequently feared retaliation by Defendants DeDonatis and Hornbacher.

90.    As a consequence of these and other troubling events, USSSA's Board, senior executives, and especially USSSA staff refrained from raising concerns relating to Defendants DeDonatis and Ceo's illicit relationship and the impact it was having on USSSA's operations and overall performance. Defendants DeDonatis and Ceo's unwillingness and inability to recognize the devastating impact that their illicit relationship had on USSSA's culture and employee morale constituted a fundamental violation of core statutory and fiduciary obligation owed to USSSA. Furthermore, Defendants Fortuna and Anderson helped foster this culture of

retaliation and silence, in shirking their duties as officers of the company.[22]   The message became very clear within USSSA – if employees raised legitimate concerns against Defendant DeDonatis or his paramour, Defendant Ceo, then USSSA leadership, with the assistance of Defendants Fortuna and Anderson, will do everything in their power to silence and retaliate against the employees to suppress the information, including terminating anyone who dared to question the operation of USSSA.

## VI. THE DEFENDANTS ILLEGALLY TERMINATED PLAINTIFF HORROM AND PLAINTIFF WEGMAN TO RETALIATE AGAINST AND SILENCE THEM

### A. The Anonymous Whistleblower (Plaintiff Horrom) Complaint About Defendant DeDonatis's and Defendant Hornbacher's Illegal Gambling Activities

91.    In late 2022, and on January 12, 2023, in two separate submissions, Plaintiff Horrom, with the assistance and support of Plaintiff Wegman (and Employee-1), filed an anonymous whistleblower complaint alleging that Defendants DeDonatis and Hornbacher were involved in illegal bookmaking and sports

---

[22] *See In Re McDonald's Corporation, Stockholder Derivative Litigation*, C.A. No. 2021-0324-JTL (January 26, 2023) (duty of oversight extends to corporate officers); *In Re The Boeing Corporation Derivative Litigation*, Civil Action. No. C.A. No. 2019-0907-MTZ, 2021 Del. Ch LEXIS 22 (Del. Ch. Feb.1, 2021) (*Caremark* claim survives motion to dismiss when Board knew of misconduct but consciously disregarded its duty to address misconduct); *Stone. v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith").

gambling activities.  Defendants DeDonatis, Fortuna, Anderson, and Hornbacher knew or suspected that Plaintiff Horrom was the anonymous whistleblower.

92.    The anonymous complaint stated that "we have proof in hand" that "shows and links [Defendant DeDonatis] to the management and participation [in] illegal offshore gambling properties and activities.  We also have text messages to and from [Defendant DeDonatis] that clearly show management of such activities performed on and at USSSA owned properties."

93.    The anonymous whistleblower threatened to report the illegal bookmaking and sports gambling activities to national media and law enforcement authorities unless USSSA took the following actions by 12:00am on January 2, 2023: (1) removal of Defendant DeDonatis from USSSA and affiliated operations; (2) removal of Defendant Fortuna, USSSA Board Chairman, from USSSA and affiliated operations, citing Defendant Fortuna's "failure to maintain obligations to USSSA as Executive Director of the Board and the protection of [Defendant DeDonatis]"; (3) clear communication, both internal to USSSA as well as publicly of the complete removal of both [Defendants DeDonatis and Fortuna]; and (4) clear communication, both internal to USSSA and publicly, that a "task force made up of internal and external members will be formed to investigate and prevent this type of activity to occur again."

94.    Almost two weeks later, on January 12, 2023, the anonymous whistleblower (Plaintiff Horrom) sent an email communication to Defendant Anderson and the USSSA Board of Directors repeating the allegations and providing more information:

> Since we have not seen or heard of any public announcement per our previous letter, we have to assume you have chosen not to take our request seriously.  Our goal is not to do any undo harm to USSSA but to hold those accountable for the administration and management of illegal offshore gambling "bookie" activities.  With this in mind, we have attached a small sample of the physical proof we have gathered that shows the extent of Don DeDonatis III active involvement in said illegal activities.  Per the attachments you will see a text message to and from Don DeDonatis III to open an account on the offshore website and the quick turnaround reply of such request being fulfilled with username and password texted back from Don DeDonatis III.  As time has gone by, we have continued to gather similar text messages from others.  We are also attaching proof of login with given account credentials to the site anysport247.com.  All this communication is via text, which has historic traceability, and can be/will be available to law enforcement.  In further research we have also found that Don DeDonatis III is working with another person within the organization in the administration and management of this illegal activity.  Based on the most recent conversations we also now believe that the knowledge of all this illegal activity is broad and well known within the USSSA organization and has been going on for an extended period of time.

> Our demands are consistent with our initial letter and the 4 demands we had in it, which in summary is the complete removal of both Don DeDonatis III and Rick Fortuna from all USSSA business operations and the clear communication to both internal members of USSSA as well as publicly of such removal.  Our actions if these are not met by end of business EDT on January 13th, 2023, will be our final act as we will send over everything we have to date over to the national media, state of Florida gaming task force as well as DOJ/FBI task forces specific to this type of activity.

This is your notice as the general counsel for USSSA, a youth and professional sport association, that you have been informed of Don DeDonatis III illegal bookie activities and of Rick Fortuna's knowledge but lack of action.

**B. Defendants DeDonatis, Fortuna, and Anderson Collaborated to Terminate Plaintiff Horrom**

95. After the January 12, 2023, email communications, Plaintiff Horrom spoke to Defendant Anderson and disclosed that he was the anonymous whistleblower. Defendant Anderson notified and informed Defendant Fortuna about the whistleblower's allegations. In response, Defendant Fortuna requested to participate in discussions and interviews of any whistleblowers or individuals who were offering information about Defendants DeDonatis and Hornbacher's illegal bookmaking and sports gambling business.

96. Defendant Anderson told Plaintiff Horrom that she would provide a legal recommendation to the USSSA Board of Directors that the USSSA Board launch an independent internal investigation of the illegal sports gambling activities. Defendant Anderson assured Plaintiff Horrom that he would be afforded whistleblower protection under USSSA's Whistleblower Policy.

97. Defendant Anderson also spoke to Plaintiff Wegman and Employee-1 about the anonymous whistleblower's allegations. Plaintiff Wegman corroborated the allegations raised by the whistleblower that Defendants DeDonatis and Hornbacher were engaged in illegal bookmaking and sports gambling activities.

98.     After speaking with Plaintiff Wegman, Plaintiff Horrom, and Employee-1, Defendant Anderson consulted with the Board of Directors.  After this meeting, Defendant Anderson told Plaintiffs Wegman, Plaintiff Horrom, and Employee-1 that "more" evidence was needed to justify an internal investigation, despite the fact that Plaintiffs Horrom and Wegman had provided more than enough evidence connecting Defendants DeDonatis and Hornbacher to the illegal bookmaking and sports gambling operation.

99.     Defendant Anderson approached Defendant Hornbacher to interview him about the bookmaking and sports gambling allegations.  Shortly afterwards, Defendant DeDonatis learned that Defendant Anderson approached Defendant Hornbacher about the illegal gambling issue.  Defendant DeDonatis objected to Defendant Anderson's attempt to conduct any sort of investigation of the allegations. Defendant Anderson did not report Defendant DeDonatis's obstruction to Defendant Fortuna or any other members of the USSSA Board of Directors.  Defendant Anderson instead stopped pursuing the whistleblower claims further.

100.    Eventually, the USSSA Board of Directors decided not to pursue the investigation, despite significant evidence concerning the alleged illegal bookmaking and sports gambling activities.  Contrary to their fiduciary and statutory obligations under Florida State law and their responsibility to investigate claims of misconduct, Defendant Fortuna, with Defendant Anderson's acceptance, acted to

suppress any investigation of Defendants DeDonatis and Hornbacher's illegal and improper activities.

101.    Not only did the Defendants act to suppress an internal investigation of allegations of illegal bookmaking and sports gambling activities, Defendants DeDonatis, Fortuna, and Anderson acted in concert to summarily terminate Plaintiff Horrom on February 1, 2023, based on a manufactured pretext, and despite Plaintiff Horrom's exceptional performance at USSSA and corresponding positive evaluations, annual raises, and bonuses.  In fact, the Defendants terminated Plaintiff Horrom in retaliation due to the fact that Plaintiff Horrom was the anonymous whistleblower who reported the illegal sports gambling activity by Defendants DeDonatis and Hornbacher.  Further, the Defendants believed that Plaintiff Horrom knew of other illegal and improper activities committed by the Defendants. Consistent with other illegal terminations intended to silence and retaliate against USSSA employees, Defendant Fortuna failed to notify other USSSA Board members of Plaintiff Horrom's termination and the illegal and improper motivation for such.

## C. **Plaintiff Wegman's Decision to Secure Whistleblower Protection**

102.    By February 2023, and in response to the summary termination of Plaintiff Horrom, Plaintiff Wegman decided to seek protection as a whistleblower in accordance with USSSA's Whistleblower Policy.   In February 2023, Plaintiff

Wegman and Defendant Anderson met, and Defendant Anderson confirmed Plaintiff Wegman's whistleblower status and protection under USSSA's Whistleblower Policy.

103.    In or around February or March 2023, Defendant DeDonatis told Plaintiff Wegman that he believed that Plaintiff Wegman was a whistleblower and may have submitted the anonymous complaint about the illegal bookmaking and sports gambling activities.   Around the same time, Defendant Hornbacher told Plaintiff Wegman that he believed that people were out to "get him."   Defendant Hornbacher stated "we" (referring to Defendants DeDonatis and Hornbacher) believed it was "you" (referring to Plaintiff Wegman) but now "believe it may be [Employee-1] who is pushing this allegation."

### D. **Defendants' Illegal Termination of Plaintiff Wegman in Violation of Federal and State Law and USSSA Whistleblower Policy**

104.    Starting in or around January or February 2023, and continuing to his termination on July 7, 2023, Defendant DeDonatis, with the assistance and support of Defendants Anderson and Fortuna, targeted Plaintiff Wegman for termination because the Defendants knew or suspected that Plaintiff Wegman was a whistleblower and participated in the submission of the anonymous complaint about Defendants' illegal bookmaking and sports gambling business, and because the

Defendants knew that Plaintiff Wegman had extensive knowledge about their lengthy course of illegal and improper conduct.[23]

105.   With the assistance of Defendants Anderson and Fortuna, Defendant DeDonatis engaged in a calculated four-step process leading to Plaintiff Wegman's retaliatory firing:

106.   First, Defendant DeDonatis conducted an annual review of Plaintiff Wegman, during which Defendant DeDonatis raised a number of false and exaggerated performance concerns about Plaintiff Wegman's conduct as a pretext to justify Plaintiff Wegman's eventual illegal termination.  Plaintiff Wegman learned that Defendant Ceo played a large role in preparing this review, and that the annual review had been reviewed by Defendant DeDonatis's personal attorneys at the law firm of Dickinson Wright PLLC.[24]

---

[23] Following Plaintiff Wegman's termination, Employee-4 contacted Plaintiff Horrom claiming that Employee-1 provided information to Defendant DeDonatis that showed Plaintiff Wegman was the whistleblower who submitted the anonymous letter on December 27, 2022, and subsequent email message on January 14, 2023.  Believing that Plaintiff Wegman was the whistleblower – or, at the very least, involved in that whistleblower report – Defendant DeDonatis began to manufacture Plaintiff Wegman's termination.

[24] Defendant DeDonatis provided Plaintiff Wegman with a Microsoft Word document that listed Defendant Ceo and the Dickinson Wright attorneys as editors.  Further, Dickinson Wright sent an invoice to USSSA for billable hours between February 19 to February 27, 2023, with the description of their work as "attention to internal matters and attention to HR matters."  USSSA paid this invoice to Defendant DeDonatis's personal attorney.

107.    Second, Defendant DeDonatis began the hiring process of Meghan Watson as the new Chief Operating Officer, which he knew would breach Plaintiff Wegman's three-year, written Employment Agreement dated January 1, 2022.

108.    Third, Defendant DeDonatis solicited Plaintiff Wegman's interest in a "new position," which would require re-negotiation of Plaintiff Wegman's three-year written Employment Agreement dated January 1, 2022.

109.    Fourth, on July 7, 2023, Defendant DeDonatis met with Plaintiff Wegman and summarily terminated him, citing a number of false, misleading, and unsupported allegations, which both Defendant DeDonatis and Plaintiff Wegman knew were false.

110.    With the assistance of Defendants Anderson and Fortuna, Defendant DeDonatis cited a number of sham pretext justifications to cover the real reason for Plaintiff Wegman's termination: that Plaintiff Wegman had secured whistleblower protection under USSSA's Whistleblower Policy and Defendant DeDonatis feared that Plaintiff Wegman might disclose extensive information concerning his illegal and improper activities.

### D. USSSA's Post Hoc Rationale to "Justify" Termination of Plaintiff Wegman

111.    In an obvious attempt to cover its illegal tracks, USSSA manufactured a *post hoc* rationalization *in an undated letter* to support its decision to fire Plaintiff Wegman.  After learning that Plaintiff Wegman intended to file a lawsuit in response

to his termination, Defendant Anderson issued the undated letter designed to provide legal cover for USSSA's illegal and improper actions.

112.  USSSA's undated letter offers the same tired excuses, regularly employed by USSSA throughout its course of protecting the Defendants and their long-standing illegal and improper conduct.  USSSA's letter fails to acknowledge Plaintiff Wegman's exceptional performance, his leadership record, his lengthy list of achievements and consistent superior performance for USSSA, and Defendant DeDonatis's decision to increase Plaintiff Wegman's salary in 2023 by approximately $24,000 and to award him a year-end bonus of $150,000.

113.  Notably, all of the reasons cited by USSSA to justify its illegal termination of Plaintiff Wegman are a stale collection of issues that were raised in Plaintiff Wegman's prior annual reviews, and by no means justify USSSA's decision to breach its written Employment Agreement with Plaintiff Wegman.[25]  Instead, the only significant change that occurred with respect to Plaintiff Wegman's performance of his Chief Operating Officer responsibilities was his decision in February 2023 to secure whistleblower protection under USSSA's Whistleblower Policy.

---

[25] Defendant DeDonatis's list of so-called deficiencies in Plaintiff Wegman's performance ignore many pertinent facts, are contradicted by USSSA documents, and are inconsistent with Plaintiff Wegman's record of strong relationships with relevant partners, sponsors, and vendors, including Event Connect, Spectrum Concessions, and Players Way.

## VII. <u>DEFENDANT DEDONATIS DEFAMES PLAINTIFF WEGMAN</u>

114.   Defendant DeDonatis's campaign of revenge against Plaintiff Wegman extended past his illegal breach and termination of Plaintiff Wegman.  Following that termination, Defendant DeDonatis communicated with important USSSA partners, sports equipment companies, insurance companies, and other contacts, colleagues, and company representatives with the intent to defame and tarnish Plaintiff's reputation.

115.   After his illegal termination, on July 7, 2023, Plaintiff Wegman received a number of phone calls from vendors, partners, and existing and former employees of USSSA to check on Plaintiff Wegman and to discuss his recent termination.  On at least two separate occasions, Defendant DeDonatis contacted USSSA's vendors, partners, and employees to spread false and defamatory information about Plaintiff Wegman.

116.   Shortly after July 7, 2023, Defendant DeDonatis called a "substantial partner," Partner-1, to notify Partner-1 that Plaintiff Wegman was terminated because Plaintiff Wegman had an extramarital affair with an employee and attempted to manipulate her and other USSSA employees.  In addition, Partner-1 indicated that Defendant DeDonatis claimed that Plaintiff Wegman "lied" to Defendant DeDonatis on one occasion when Plaintiff Wegman told Defendant

DeDonatis that he took a flight to Ohio on a Friday evening, but in fact Plaintiff Wegman stayed in Florida for the weekend.

117. In another contact, on July 10, 2023, Partner-2 contacted Plaintiff Wegman and reported that Defendant DeDonatis told Partner-2 that Plaintiff Wegman was terminated from USSSA because of his actions "around the office" and that Plaintiff Wegman was "sleeping with an employee."

## VIII. DEFENDANTS REGULARLY FLOUTED USSSA POLICIES AND PROCEDURES AND VIOLATED THEIR RESPECTIVE FIDUCIARY DUTIES OWED TO USSSA, ITS MEMBERS, AND BENEFICIARIES OF ADULT AND YOUTH SPORTS

118. As part of its internal governance and compliance structure, USSSA adopted a number of important internal policies and procedures intended to promote a positive culture of ethics and compliance. In practice, however, Defendant DeDonatis, as the Chief Executive Officer, and the other Defendants regularly violated these basic policies and procedures, along with applicable federal and Florida law. As a result of their failure to abide by their statutory and fiduciary duties, USSSA's culture deteriorated into an organization riddled with lawless behavior, where employees were regularly retaliated against and silenced, funds were used for private benefits, and promotions and job qualifications were ignored and determined by favoritism, loyalty, and other non-performance related qualifications.

119.    Defendants DeDonatis, Fortuna, and Anderson breached their statutory and fiduciary duties of loyalty, care, and obedience to USSSA by using their powers as Chief Executive Officer, Chairman of the Board, and General Counsel/Ethics and Compliance Officer, respectively, to obtain illegal compensation and benefits, to convert USSSA funds for their own benefit, to engage in illegal activities, and to dominate, control, and direct USSSA to obtain private benefits for themselves and for certain other insiders, including Defendants Ceo and Hornbacher.  Moreover, each of the Defendants acted to retaliate against known or suspected whistleblowers and executives and staff who raised information concerning illegal and improper conduct at USSSA in violation of USSSA policies and procedures and applicable federal and state whistleblower protection laws.  In the end, Defendants undermined and damaged USSSA's mission, its members, and, ultimately, its beneficiaries – adult and youth sports teams, leagues, and events.  *See McCall v. Scott*, 250 F.3d 997, 1001 (6th. Cir. 2001) (Directors violate duty of good faith when they consciously disregard duty to investigate misconduct). "It is a 'cardinal principle' that a director will not be allowed to make an undisclosed profit adverse to the interests of the corporation, nor will he be permitted to acquire for his own advantage interests adverse or antagonistic to the corporation." *Conboy v. Black Diamond Props., Inc.*, No. 5:08-cv-236-Oc-GRJ, 2010 U.S. Dist. LEXIS 74474, at *34-35 (M.D. Fla. July 23, 2010).  Defendants' course of conduct as set forth in this

Complaint shows precisely that they each were committed to furthering their own interests, protecting their own lucrative positions, and operating with impunity, while sacrificing USSSA's mission – to operate high-quality adult and youth sports programs, leagues, and events across the nation.

120.   Moreover, Defendants DeDonatis, Fortuna, and Anderson, sitting in significant leadership roles, engaged in activities that threatened USSSA's not-for-profit status and constituted actionable conflicts in violation of USSSA's Conflicts of Interest Policy.  These actions also violated Florida State statutory and common law regarding the standard of care for directors and officers.

121.   Pursuant to Fla. Stat. Ann. § 617.0830, directors are required to "discharge his or her duties as a director, including his or her duties as a member of a committee: (a) In good faith; (b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (c) In a manner he or she reasonably believes to be in the best interests of the corporation." This fiduciary duty "'mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.'" *Kremer v. Lysich*, No. 3:19-cv-887-BJD-JBT, 2022 U.S. Dist. LEXIS 236483, at *12 (M.D. Fla. Sep. 28, 2022) (quoting *Taubenfeld v. Lasko*, 324 So. 3d 529, 538 (Fla. 4th DCA 2021)).  In

addition, pursuant to Fla. Stat. Ann. § 617.0832, directors have a duty of loyalty to the not-for-profit and are prohibited from engaging in self-dealing.[26]

## IX. RICO ALLEGATIONS

122.    Plaintiff Wegman and Plaintiff Horrom reallege and incorporate by reference Paragraphs 1 to 121 as if fully set forth herein.

123.    As detailed in Paragraphs 28 to 121, Defendants USSSA, DeDonatis, Fortuna, Anderson, Ceo, and Hornbacher (the "RICO Defendants"), conducted or participated in the conduct of an enterprise, USSSA, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

124.    Alternatively, the RICO Defendants, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise, USSSA, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  The actions of the RICO Defendants as against Plaintiffs, and as described above, were in furtherance of the RICO Defendants' conspiracy and in violation of 18 U.S.C. § 1962(d).

### A.    The RICO Enterprise

125.    USSSA was and is the passive instrument of the RICO Defendants' racketeering activity and constitutes an "enterprise" as that term is defined in 18

---

[26] More specifically, directors are prohibited from entering into related party transactions unless the transaction is determined and documented by the Board or an authorized committee of the Board to be fair, reasonable, and in the corporation's best interest at the time it was authorized.

U.S.C. § 1961(4), separate and distinct from the individual RICO Defendants named herein.

126.    From approximately 2018 and continuing through July 2023, the RICO Defendants, as well as others known or unknown, being persons employed by and associated with USSSA, which was and is engaged in and the activities of which affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts set forth herein.

127.    Plaintiffs seek to prohibit the RICO Defendants from utilizing the pattern of unlawful conduct in which they have continually engaged during the relevant time period.

128.    The pattern of racketeering engaged in by the RICO Defendants involved at least two separate but related acts of racketeering activity, carried out from approximately 2018 to in or about July 2023.

129.    Plaintiff Wegman and Plaintiff Horrom were directly injured by the RICO Defendants' acts of racketeering activity.  The RICO Defendants have made unlawful and unwarranted financial gains and have directly interfered with Plaintiff Wegman's and Plaintiff Horrom's lawful employment and livelihood by affecting their respective abilities to obtain lawful employment.

**B.      Predicate Acts & The Pattern of Racketeering Activity**

130.    Section 1961(1) of RICO provides that "racketeering activity" includes: (a) any act indictable under 18 U.S.C. §§ 1084 (relating to transmission of gambling information), 1341 (relating to mail fraud), 1343 (relating to wire fraud), 1512 (relating to tampering with a witness, victim, or an informant), 1513 (relating to retaliating against a witness, victim, or an informant), 1955 (relating to the prohibition of illegal gambling business), 1956 (relating to the laundering of monetary instruments), and 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and (b) dealing in a controlled substance: Trenbolone, a prohibited Schedule III drug, and Adderall, a prohibited Schedule II drug, each of which is punishable under Florida law as a third-degree felony, up to five (5) years in prison and a fine up to $5000. *Fla. Stat. §893.13.6(a)(2023).*

131.    As set forth below, the RICO Defendants engaged in conduct violating 18 U.S.C. §§ 1084, 1341, 1343, 1512, 1513, 1952, 1955, 1956, and 1957 and *Fla. Stat.* §893.13.6(a)(2023) to effectuate their unlawful scheme.

132.    The RICO Defendants' acts were not isolated, but rather formed a pattern of conduct through which the RICO Defendants used the enterprise, USSSA, to benefit each of the Defendants through preservation of lucrative salaries and compensation, diversion of USSSA funds for illegal and personal use, to defraud the

IRS and United States taxpayers, to manipulate USSSA's books and records to evade oversight and submit false information to defraud the IRS, and to silence and retaliate against Plaintiffs from exposing the RICO Defendants' ongoing and continuing racketeering activities.

133.    The pattern of the RICO Defendants' illegal racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), and 18 U.S.C. §§ 1084, 1341, 1343, 1512, 1513, 1955, 1952, 1956 and 1957, and Florida Statute §893.13.6(a)(2023), are set forth and specifically alleged in the following Sections C through I below.

**C.    Illegal Bookmaking and Sports Gambling and Money Laundering (18 U.S.C. §§ 1084, 1952, 1955, 1956, 1957)**

134.    Plaintiff Wegman and Plaintiff Horrom reallege and incorporate by reference Paragraphs 34 to 39, Paragraphs 78 to 113, and Paragraphs 118 to 121 above against the RICO Defendants as if fully set forth herein.

135.    Beginning in or about sometime in 2014 and continuing until in or about July 2023, Defendants DeDonatis and Hornbacher operated an illegal bookmaking and sports gambling business.  Defendant DeDonatis and Defendant Hornbacher's illegal bookmaking and sports gambling business violated both various RICO predicates and federal criminal statutes relating to illegal gambling and associated money laundering violations:[27]   (1) the Illegal Gambling Business

---

[27] Florida law also prohibits both illegal bookmaking and sports gambling. *Chapter 849, Gambling, Fla. Stat. §849.25, Illegal Bookmaking; Chapter 849, Gambling, Fla Stat. Ann §849.14, Unlawful to Bet on Result of Trial or Contest of Skill*. Illegal bookmaking and sports gambling are

Act, 18 U.S.C. §1955; (2) the Wire Act, 18 U.S.C. §1084; (3) the use of facilities of interstate commerce to conduct an illegal gambling business under the Travel Act, 18 U.S.C. §1952; (4) laundering the proceeds from an illegal gambling business under money laundering provisions of 18 U.S.C. §1956; and (5) to spend more than $10,000 of the proceeds from an illegal gambling operation at any one time and place under the money laundering provisions, 18 U.S.C. §1957.

### D.    Mail Fraud (18 U.S.C. § 1341) and Wire Fraud (18 U.S.C. § 1343)

#### 1.    *Fraudulent Use of USSSA Credit Card*

136.    Plaintiff Wegman and Plaintiff Horrom reallege and incorporate by reference Paragraphs 34 to 74 against the RICO Defendants as if fully set forth herein.

137.    Beginning at least sometime in 2018, Defendant DeDonatis regularly used USSSA funds to misuse and embezzle money using USSSA's credit card for himself and Defendant Ceo for a range of benefits, including lavish dinners, resort and spa stays, gifts and flowers, regular meals, and gasoline for Defendant DeDonatis's personal vehicle.  In all these instances, Defendant DeDonatis violated federal wire and mail fraud prohibitions by utilizing USSSA's corporate credit card

---

punishable as a third-degree felony, up to five (5) years in prison and a fine of up to $5000.  *Fla. Stat. Ann. §§ 775.082 or 775.083.*

for personal benefits and expenses while avoiding repayment of any of these expenses or declaring the benefits as income in his federal tax return.

## 2. *Financial Reporting Manipulation and Fraud*

138.  Plaintiff Wegman and Plaintiff Horrom reallege and incorporate by reference Paragraphs 34 to 74 against the RICO Defendants as if fully set forth herein.  As detailed above, Defendant DeDonatis, with the assistance of Defendant Hornbacher, took steps to manipulate USSSA's financial records, falsify accounts, and doctor USSSA's books and records in order to ensure favorable financial reports, to divert funds for his and Defendant Hornbacher's benefit, and to prevent USSSA Board oversight and questions concerning certain USSSA programs, financial budgets, and program-specific revenue reporting.

139.  In 2021 and 2022, Defendant DeDonatis, with the assistance of Defendant Hornbacher, diverted USSSA revenues from National Skills Competitions to "their slush fund."  A conservative estimate of diverted funds in 2021 and 2022 amounts to approximately $48,000 in each year, respectively.

140.  Defendant DeDonatis diverted revenue for two annual USSSA national events in 2022 (the Space Coast Global World Series and the Firecracker World Series), and three annual USSSA national events in 2023 (the Space Coast Global World Series, the Firecracker World Series, and the Panama City Global World Series).

141.   In 2022, Defendant DeDonatis's diverted $126,160 in entry fees for the Firecracker World Series, and $69,075 in entry fees for the Global World Series.  In 2023, Defendant DeDonatis diverted $99,885, in entry fees for the Firecracker World Series, $67,095 in entry fees for the Global World Series, and $25,900 in event sanction fees for the Panama City Global World Series.

142.   In or about August through October 2022, Defendant DeDonatis directed the USSSA financial staff to remove approximately $55,000 in expenses from the Florida Pride books and records and then add them to the USSSA, LLC books and records, including expenses for uniforms, player cards, and laundry from the Florida Pride.  As a result, Defendant DeDonatis submitted a false profit and loss report to the USSSA Board Members.

143.   In February 2023, Defendant DeDonatis instructed Plaintiff Wegman and Employee-1 to enter a 2023 expense from an invoice issued by Withum Consulting services in USSSA's 2022 financial books rather than 2023 when the expense was actually incurred.

### 3.    *USSSA False Form 990 Filings*

144.   Plaintiff Wegman and Plaintiff Horrom reallege and incorporate by reference Paragraphs 34 to 74 against the RICO Defendants as if fully set forth herein.  As the Chief Executive Officer of USSSA, Defendant DeDonatis executed, under penalty of perjury, USSSA's Annual Form 990 filings for years 2018, 2019,

2020, and 2021, and knew that the representations and financial reports were based on false information.

145.   Each of these filings contain financial inaccuracies based on the conduct outlined above, including: (1) over-reporting USSSA expenses during 2018 to 2023 that were incurred by Defendants DeDonatis and Ceo for their own personal benefits; (2) under-reporting USSSA revenues in 2021 and 2022 that were diverted from National Skills Competition to Defendants DeDonatis and Hornbacher for their personal use; (3) under-reporting USSSA revenues in 2022 and 2023 that were diverted from National Events; (4) under-reporting USSSA expenses incurred by Florida Pride in 2022; and (5) under-reporting USSSA expenses incurred in 2023.

**E.     Tampering with a Witness, Victim, or an Informant and Retaliating Against a Witness, Victim, or an Informant (18 U.S.C. §§ 1512 and 1513)**

146.   Plaintiff Wegman and Plaintiff Horrom reallege and incorporate by reference Paragraphs 34 to 113 above against the RICO Defendants as if fully set forth herein.

147.   Plaintiff Horrom submitted two separate anonymous reports concerning Defendant DeDonatis and Defendant Hornbacher's illegal bookmaking and sports gambling business in late December 2022 and on January 12, 2023.  RICO Defendants Anderson and Fortuna knew, at the time, that Plaintiff Horrom was the

anonymous whistleblower.  Defendant DeDonatis and Defendant Hornbacher knew or suspected that Plaintiff Horrom was the anonymous whistleblower.

148.   To prevent, hinder, or delay the communication to a law enforcement officer of information relating to the possible commission of a Federal offense, i.e. illegal bookmaking and sports gambling activities, the RICO Defendants DeDonatis, Fortuna, and Anderson acted in concert to summarily terminate Plaintiff Horrom on February 1, 2023, based on a manufactured pretext, false employment Annual Review documents despite Plaintiff Horrom's exceptional performance at USSSA and corresponding positive evaluations, annual raises, and bonuses.

149.   In February 2023, Plaintiff Wegman obtained his status as a formal whistleblower under USSSA's Whistleblower Policy.

150.   To prevent, hinder or delay the communication to a law enforcement officer of information relating to the possible commission of a federal offense, i.e. illegal bookmaking and sports gambling activities, the RICO Defendants acted in concert to summarily terminate Plaintiff Wegman on July 7, 2023.   With the assistance of RICO Defendants Anderson and Fortuna, RICO Defendants DeDonatis and Ceo generated false documentation as part of Plaintiff Wegman's Annual Review as a pretext to justify terminating Plaintiff Wegman.  The RICO Defendants believed that Plaintiff Wegman was a whistleblower who had extensive information

about the RICO Defendants racketeering activities and acted in concert to prevent any communication of information about the RICO Defendants illegal activities.

151.    It was part of the RICO Defendants' scheme to falsify USSSA's business records relating to the employment and annual reviews of Plaintiff Wegman and Plaintiff Horrom to obstruct, influence, or impede any official proceeding or attempt to do so relating to the availability of those records in any future proceedings brought by the Department of Labor and/or the Internal Revenue Service, in violation of 18 U.S.C. § 1512(c)(1).

**F.    Florida Drug Abuse and Prevention Control Act:  *Fla. Stat. §893.13.6(a)(2023)***

152.    Plaintiff Wegman and Plaintiff Horrom reallege and incorporate by reference Paragraphs 34 to 37, Paragraphs 59 to 63, Paragraphs 75 to 77, and Paragraphs 91 to 113 against the RICO Defendants as if fully set forth herein.

153.    In or about the period from in or about 2018 to in or about 2023, Defendant DeDonatis possessed and used two illegal drugs – Adderall is an amphetamine and listed as a Schedule II controlled substance and Trenbolone is an anabolic steroid and listed as a Schedule III controlled substance.  Under Florida law, possession of Adderall and possession of Trenbolone are punishable as a third-degree felony, up to five (5) years in prison, and a fine of up to $5,000.

### G.    General Allegations

154.   All predicate acts committed by the RICO Defendants are related and were committed with a common scheme in mind: to benefit each of the Defendants through preservation of lucrative salaries and compensation, diversion of USSSA funds for illegal and personal use, to defraud the IRS and United States taxpayers, to manipulate USSSA's books and records to evade oversight and submit false information to defraud the IRS, and to silence and retaliate against Plaintiffs from exposing the RICO Defendants' ongoing and continuing racketeering activities.

155.   Plaintiff Wegman and Plaintiff Horrom were directly injured by the RICO Defendants' acts of racketeering activity. The RICO Defendants have made unlawful and unwarranted financial gains and have directly interfered with Plaintiff Wegman's and Plaintiff Horrom's lawful employment and livelihood by affecting their respective abilities to obtain lawful employment.

### H.    RICO Violation: 18 U.S.C. § 1962(c)

156.   Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by . . . any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."

157.   The RICO Defendants are employed by an enterprise, USSSA, which engages in interstate and foreign commerce.

67

158.    The RICO Defendants, as employees and board members of the enterprise, used their positions with USSSA to conduct or participate, directly or indirectly, in the conduct of USSSA's affairs through a pattern of racketeering activity.

159.    The RICO Defendants' pattern of racketeering activity consists of predicate acts including illegal bookmaking and sports gambling, money laundering, mail fraud, wire fraud, illegal drug use, tampering and retaliation.

160.    As set forth above, the pattern of racketeering activity engaged in by the RICO Defendants was for the common purpose of: to benefit each of the Defendants through preservation of lucrative salaries and compensation, diversion of USSSA funds for illegal and personal use, to defraud the IRS and United States taxpayers, to manipulate USSSA's books and records to evade oversight and submit false information to defraud the IRS, and to silence and retaliate against Plaintiffs from exposing the RICO Defendants' ongoing and continuing racketeering activities.

## I.    RICO Violation: 18 U.S.C. § 1962(d)

161.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

162.    The RICO Defendants' conspired to benefit each of the Defendants through preservation of lucrative salaries and compensation, diversion of USSSA

funds for illegal and personal use, to defraud the IRS and United States taxpayers, to manipulate USSSA's books and records to evade oversight and submit false information to defraud the IRS, and to silence and retaliate against Plaintiffs from exposing the RICO Defendants' ongoing and continuing racketeering activities.

163.    Each RICO Defendant agreed to participate, directly or indirectly, in the conduct of the affairs of USSSA through a pattern of racketeering activity comprised of numerous acts of illegal bookmaking and sports gambling activities, money laundering, mail fraud, wire fraud, illegal drug use, tampering, and retaliation, and each RICO Defendant so participated in violation of 18 U.S.C. § 1962(c).

## **COUNT ONE: VIOLATION OF RICO 18 U.S.C. § 1962(c)**

164.    Plaintiff Wegman and Plaintiff Horrom reallege and incorporate by reference Paragraphs 1 to 163 above against the RICO Defendants, as if fully set forth herein.

165.    As alleged with particularity above, the facts demonstrate that the RICO Defendants willingly and knowingly conducted or participated directly, in the conduct of USSSA's affairs through a pattern of racketeering activity.

166.    As alleged with particularity above, as a direct and proximate result of the RICO Defendants' aforementioned RICO conduct, Plaintiff Wegman and Plaintiff Horrom were directly and irreparably injured by the RICO Defendants' acts

of racketeering activity that directly interfered with Plaintiff Wegman's and Plaintiff Horrom's lawful employment and livelihood by affecting their respective abilities to obtain lawful employment.

167.   As alleged with particularity above, the RICO Defendants are jointly and severally liable to each Plaintiff for treble damages, together with all costs for this action, plus reasonable attorneys' fees as provided by 18 U.S.C. § 1964.

168.   To the extent permitted by law, each Plaintiff is entitled to damages, plus court costs, and pre- and post-judgment interest at the legally allowable limit.

## COUNT TWO: VIOLATION OF RICO 18 U.S.C. § 1962(d)

169.   Plaintiff Wegman and Plaintiff Horrom reallege and incorporate by reference Paragraphs 1 to 163 above against the RICO Defendants as if fully set forth herein.

170.   As alleged with particularity above, the facts demonstrate that the RICO Defendants conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of USSSA through a pattern of racketeering activity.

171.   As alleged with particularity above, as a direct and proximate result of the RICO Defendants' aforementioned RICO conduct, Plaintiff Wegman and Plaintiff Horrom were directly and irreparably injured by the RICO Defendants' acts of racketeering activity that directly interfered with Plaintiff Wegman's and Plaintiff

Horrom's lawful employment and livelihood by affecting their respective abilities to obtain lawful employment.

172.   As alleged with particularity above, the RICO Defendants are jointly and severally liable to each Plaintiff for treble damages, together with all costs for this action, plus reasonable attorneys' fees as provided by 18 U.S.C. § 1964.

173.   To the extent permitted by law, each Plaintiff is entitled to damages, plus court costs, and pre- and post-judgment interest at the legally allowable limit.

## **PRAYER FOR RELIEF AS TO RICO COUNTS ONE AND TWO**

**WHEREFORE**, Plaintiffs Wegman and Horrom pray that the Court enter judgment in their favor and against the RICO Defendants, containing the following relief:

a. Treble the amount of all wages and benefits each Plaintiff would have received but for Defendants' unlawful conduct, including but not limited to back pay, front pay, and pre-judgment interest;

b. Compensatory damages in an amount to be determined at trial to compensate Plaintiff for the damage to reputation, loss of career, humiliation, anguish, and emotional distress caused by the RICO Defendants' unlawful conduct;

c. Treble and/or punitive damages as allowed by law;

d.  An award of reasonable attorneys' fees, costs, and litigation expenses pursuant to 18 U.S.C. § 1964(c) and all other applicable statutes; and

e.  Such other relief as the Court may deem just or equitable.

### COUNT THREE: BREACH OF CONTRACT
### (BY PLAINTIFF WEGMAN AGAINST DEFENDANTS USSSA, DEDONATIS, FORTUNA, ANDERSON, AND CEO)

174.  Plaintiff Wegman realleges and incorporates by reference Paragraphs 28 to 31 and Paragraphs 34 to 113, against Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo as if fully set forth herein.

175.  On January 1, 2022, Plaintiff Wegman was hired by Defendant USSSA as the Chief Operating Officer pursuant to a written Employment Agreement dated January 1, 2022, for a three-year term, until January 1, 2025.

176.  Plaintiff Wegman dutifully performed work and provided services to Defendant USSSA in compliance with the January 1, 2022, Employment Agreement as described above.

177.  Pursuant to Section 3, the Employment Agreement could only be terminated "for cause" as defined therein under certain specified conditions, and otherwise could only be terminated "without cause" if an additional one-year salary and bonus amount were timely paid to Plaintiff Wegman and his benefits remained in place for a one-year period thereafter.  None of these material provisions have been adhered to by Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo.

178.    Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo purported to terminate Plaintiff Wegman "for cause" based on pretextual facts that the Defendants knew were false.

179.    Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo, therefore, materially breached the written Employment Agreement between USSSA and Plaintiff Wegman.

180.    As a result of Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo's breach of the Employment Agreement, Plaintiff Wegman has suffered, and continues to suffer, damages, including but not limited to the loss of compensation and benefits.

## COUNT FOUR: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
## (BY PLAINTIFF WEGMAN AGAINST DEFENDANTS USSSA, DEDONATIS, FORTUNA, ANDERSON, AND CEO)

181.    Plaintiff Wegman realleges and incorporates by reference Paragraphs 28 to 31 and Paragraphs 34 to 113, against Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo as if fully set forth herein.

182.    On January 1, 2022, Defendant USSSA entered into a written Employment Agreement with Plaintiff Wegman for a three-year term, until January 1, 2025.  An implied covenant of good faith and fair dealing exists in that contract.

183.   Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo had a duty to act in good faith and deal fairly with Plaintiff Wegman in carrying out the terms of the Employment Agreement.

184.   At all relevant times, Plaintiff Wegman acted in good faith and carried out the terms of his Employment Agreement.

185.   Pursuant to Section 3, the Employment Agreement could only be terminated "for cause" as defined therein under certain specified conditions, and otherwise could only be terminated "without cause" if an additional one-year salary and bonus amount were timely paid to Plaintiff Wegman and his benefits remained in place for a one-year period thereafter.

186.   As more fully set forth in Count Three above, Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo breached Sections 1 through 3 of the Employment Agreement by terminating Plaintiff Wegman without the requisite cause, for pretextual and unjustified reasons that did not support his termination.

187.   Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo breached the implied covenant of good faith and fair dealing by failing and refusing to carry out the express terms of the Employment Agreement in good faith.  Defendants' conduct was not consistent with Plaintiff Wegman's reasonable expectations under the Employment Agreement.

188.   As a result of Defendants USSSA, DeDonatis, Fortuna, Anderson, and Ceo's breach of the implied covenant of good faith and fair dealing, Plaintiff Wegman has suffered, and continues to suffer, damages, including but not limited to the loss of compensation and benefits.

### COUNT FIVE: BREACH OF ORAL CONTRACT
### (BY PLAINTIFF HORROM AGAINST DEFENDANTS USSSA, DEDONATIS, FORTUNA, AND ANDERSON)

189.   Plaintiff Horrom realleges and incorporates by reference Paragraphs 28 to 29, Paragraphs 32 to 33, Paragraphs 37 to 39, and Paragraphs 91-101 against Defendants USSSA, DeDonatis, Fortuna, and Anderson as if fully set forth herein.

190.   Plaintiff Horrom was an employee of USSSA from January 2019 until he was terminated by USSSA in February 2023.

191.   Due to his exceptional performance, USSSA sought to promote Plaintiff Horrom to an executive position and did so in December 2021, when the company promoted Plaintiff Horrom to Vice President of Technology and Advanced Media.

192.   For this new position, Plaintiff Horrom and USSSA entered into a valid and binding oral contract for a certain and definite proposition, whereby, among other rights, USSSA and Defendant DeDonatis promised Plaintiff Horrom, and Plaintiff Horrom was entitled to, certain compensation for work including

remuneration in the form of a base salary plus bonus payments to match his promotion.

193.   USSSA's obligation to make certain compensation payments to Plaintiff Horrom was non-discretionary, and the amounts ultimately due and owing were quantifiable, calculable, and not subject to any contingencies that would preclude Plaintiff Horrom's right to payment.

194.   Plaintiff Horrom performed all duties required of him under the oral contract and his work resulted in the accrual of compensation.

195.   Defendants USSSA, DeDonatis, Fortuna, and Anderson materially breached the contract by not paying Plaintiff Horrom the compensation it owed him pursuant to the agreement.

196.   As a result of Defendants USSSA, DeDonatis, Fortuna, and Anderson's breaches, Plaintiff Horrom has been damaged in an amount of all compensation not properly paid pursuant to the agreement, plus interest.

## COUNT SIX: BREACH OF IMPLIED IN FACT CONTRACT (BY PLAINTIFF HORROM AGAINST DEFENDANTS USSSA, DEDONATIS, FORTUNA, AND ANDERSON)

197.   Plaintiff Horrom realleges and incorporates by reference Paragraphs 28 to 29, Paragraphs 32 to 33, Paragraphs 37 to 39, and Paragraphs 91 to 101 against Defendants USSSA, DeDonatis, Fortuna, and Anderson as if fully set forth herein.

198.   Plaintiff Horrom was an employee of USSSA from January 2019 until he was terminated by USSSA in February 2023.

199.   Due to his exceptional performance, USSSA sought to promote Plaintiff Horrom to an executive position and did so in December 2021, when the company promoted Plaintiff Horrom to Vice President of Technology and Advanced Media.

200.   For this new position, Plaintiff Horrom and USSSA entered into a valid and binding implied in fact contract for a certain and definite proposition, whereby, among other rights, USSSA tacitly promised Plaintiff Horrom, and Plaintiff Horrom was entitled to, certain compensation for work including remuneration in the form of a base salary plus bonus payments to match his promotion.

201.   USSSA's obligation to make certain compensation payments to Plaintiff Horrom was non-discretionary, and the amounts ultimately due and owing were quantifiable, calculable, and not subject to any contingencies that would preclude Plaintiff Horrom's right to payment.

202.   Plaintiff Horrom performed all duties required of him under the implied in fact contract and his work resulted in the accrual of compensation.

203.   Defendants USSSA, DeDonatis, Fortuna, and Anderson materially breached the contract by not paying Plaintiff Horrom the compensation it owed him pursuant to the contract.

204.    As a result of Defendants USSSA, DeDonatis, Fortuna and Anderson's breaches, Plaintiff Horrom has been damaged in an amount of all compensation not properly paid pursuant to the agreement, plus interest.

### COUNT SEVEN: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING (BY PLAINTIFF HORROM AGAINST DEFENDANTS USSSA, DEDONATIS, FORTUNA, AND ANDERSON)

205.    Plaintiff Horrom realleges and incorporates by reference Paragraphs 28 to 29, Paragraphs 32 to 33, Paragraphs 37 to 39, and Paragraphs 91 to 101 against Defendants USSSA, DeDonatis, Fortuna, and Anderson as if fully set forth herein.

206.    Plaintiff Horrom was an employee of USSSA from January 2019 until he was terminated by USSSA in February 2023.

207.    In December 2021, Plaintiff Horrom and Defendant USSSA entered into a valid, enforceable, oral or implied in fact contract pursuant to which USSSA promised Plaintiff Horrom, and Plaintiff Horrom was entitled to receive compensation for his work including remuneration in the form of a base salary plus bonus payments to match his promotion.

208.    An implied covenant of good faith and fair dealing exists in that oral or implied in fact contract.

209.    Defendants USSSA, DeDonatis, Fortuna and Anderson had a duty to act in good faith and deal fairly with Plaintiff Horrom in carrying out the terms of that oral or implied in fact contract.

210.   At all times prior to his wrongful termination in February 2023, Plaintiff Horrom acted in good faith in performing his job duties pursuant to the oral or implied in fact contract, and Defendants USSSA, DeDonatis, Fortuna and Anderson at all times accepted the benefits of Plaintiff Horrom's performance under the contract. As such, Plaintiff Horrom reasonably expected to receive compensation and benefits pursuant to that contract.

211.   As more fully set forth in Counts Five and Six above, Defendant USSSA breached its oral or implied in fact contract with Plaintiff Horrom by failing to pay him all compensation to which he was entitled and by terminating his employment in February 2023 without cause and in retaliation for his whistleblower reports.  Such conduct also breached the implied covenant of good faith and fair dealing in the oral or implied in fact contract.

212.   Defendants USSSA, DeDonatis, Fortuna and Anderson's conduct was not consistent with Plaintiff Horrom's reasonable expectations under the oral or implied in fact contract.

213.   As a result of Defendants USSSA, DeDonatis, Fortuna and Anderson's breach of the implied covenant of good faith and fair dealing, Plaintiff Horrom has suffered, and continues to suffer, damages, including but not limited to all compensation not properly paid pursuant to his contract, plus interest.

## COUNT EIGHT: NEGLIGENT MISREPRESENTATION
## (BY PLAINTIFF HORROM AGAINST DEFENDANTS USSSA, DEDONATIS, FORTUNA, AND ANDERSON)

214.   Plaintiff Horrom realleges and incorporates by reference Paragraphs 28 to 29, Paragraphs 32 to 33, Paragraphs 37 to 39, and Paragraphs 91 to 101 against Defendants USSSA, DeDonatis, Fortuna, and Anderson as if fully set forth herein.

215.   Defendants  USSSA,  DeDonatis,  Fortuna,  and  Anderson  made representations of material facts concerning certain aspects of Plaintiff Horrom's compensation, which were contrary to a later asserted position.  Plaintiff Horrom was told on numerous occasions that his future with USSSA would be secure, and his  efforts  would  be  rewarded  with  a  long-term  executive-level  employment agreement  and  compensation  package,  to  match  his  appointment  to  USSSA's executive  management  team,  including  an  executive-level  salary  in  the  range  of $220,000 to $250,000 with additional bonuses.

216.   The  circumstances  were  such  that  Defendants  USSSA,  DeDonatis, Fortuna,  and  Anderson  knew  or  should  have  known  of  the  falsity  of  the representations and that Plaintiff Horrom's future with the company was not assured or protected.

217.   In  making  the  representations,  Defendants  USSSA,  DeDonatis, Fortuna,  and  Anderson  intended  that  Plaintiff  Horrom  rely  upon  and  act  on  the

representations, and Plaintiff Horrom did rely on the false statements, dutifully performing work and providing services to USSSA.

218.   Plaintiff Horrom reasonably relied on Defendants USSSA, DeDonatis, Fortuna, and Anderson's representations in deciding to undertake efforts on USSSA's behalf relating to the growth and profitability of the business.

219.   As a result of Defendants USSSA, DeDonatis, Fortuna, and Anderson's negligent misrepresentations and Plaintiff Horrom's justifiable reliance, Plaintiff Horrom has been damaged.

## COUNT NINE: DEFAMATION
## (BY PLAINTIFF WEGMAN AGAINST DEFENDANTS USSSA AND DEDONATIS)

220.   Plaintiff Wegman realleges and incorporates by reference Paragraphs 114 to 117 against Defendants USSSA and DeDonatis as if fully set forth herein.

221.   Defendant DeDonatis published false statements about Plaintiff Wegman including, but not limited to, statements that Plaintiff Wegman acted in an unethical manner.

222.   Defendant DeDonatis statements were published to third parties.  After his illegal termination, on July 7, 2023, and as recounted herein, on at least two separate occasions, Defendant DeDonatis contacted USSSA's vendors, partners, and employees to spread false and defamatory information about Plaintiff Wegman.  In one instance, Defendant DeDonatis told a partner that USSSA terminated Plaintiff

Wegman because he had an extramarital affair with an employee and attempted to manipulate her and other USSSA employees and that Plaintiff Wegman had "lied" about his whereabouts.  In another contact, on July 10, 2023, Defendant DeDonatis told a partner that USSSA terminated Plaintiff Wegman because of his actions "around the office" and that Plaintiff Wegman was "sleeping with an employee."

223.   Upon information and belief, Defendant DeDonatis has made other false and defamatory statements against Plaintiff Wegman that will be revealed through discovery in this action.

224.   The falsity of Defendant DeDonatis's statements caused injury to Plaintiff Wegman's professional reputation among a significant minority of the community and have jeopardized his economic well-being.

225.   Defendant DeDonatis engaged in this conduct intentionally for the purpose of harassing, intimidating, and/or harming Plaintiff Wegman.

226. Defendant DeDonatis's defamatory statements needlessly and maliciously impugn Plaintiff Wegman's character and professional reputation, and furthered the same retaliatory conduct that resulted in Plaintiff Wegman's wrongful termination.

## <u>COUNT TEN: DEFAMATION *PER SE*</u>
## <u>(BY PLAINTIFF WEGMAN AGAINST DEFENDANTS USSSA AND DEDONATIS)</u>

227.    Plaintiff Wegman realleges and incorporates by reference Paragraphs 114 to 117 against Defendants USSSA and DeDonatis as if fully set forth herein.

228.    Defendant DeDonatis published false statements about Plaintiff Wegman including, but not limited to, statements that Plaintiff Wegman acted in an unethical manner.

229.    Defendant DeDonatis statements were published to third parties.  After his illegal termination, on July 7, 2023, and as recounted herein, on at least two separate occasions, Defendant DeDonatis contacted USSSA's vendors, partners, and employees to spread false and defamatory information about Plaintiff Wegman.

230.    Upon information and belief, Defendant DeDonatis has made other false and defamatory statements against Plaintiff Wegman that will be revealed through discovery in this action.

231.    The falsity of Defendant DeDonatis's statements caused injury to Plaintiff Wegman's professional reputation among a significant minority of the community and have jeopardized his economic well-being.

232.    Defendant DeDonatis engaged in this conduct intentionally for the purpose of harassing, intimidating, and/or harming Plaintiff Wegman.

233.    Defendant DeDonatis's egregious statements are so clearly defamatory and damaging to Plaintiff Wegman's professional reputation that Defendant DeDonatis's malice and Plaintiff's damages are presumed.

### COUNT ELEVEN: VIOLATION OF THE FLORIDA PRIVATE WHISTLEBLOWER ACT (FLA. STAT. § 448.102(3)) – RETALIATION (BY PLAINTIFF WEGMAN AGAINST ALL DEFENDANTS)

234.    Plaintiff Wegman realleges and incorporates by reference Paragraphs 28 to 163 against all the Defendants as if fully set forth herein.

235.    Florida's Private Whistleblower Act, *Fla. Stat. Ann § 448.102*, prohibits an employer from retaliating against an employee who objected to, or refused to participate in, any activity, policy, or practice in violation of a law, rule, or regulation.

236.    As set forth in detail above, over a period of at least five years, from 2018 to 2023, Defendants engaged in illegal and improper activities.  Plaintiff Wegman knew of and was a witness to much of the Defendants' illegal and improper conduct, which violated USSSA's governing documents, state and federal tax laws, federal racketeering and other federal laws, as well as state statutory and common law.

237.    Plaintiff Wegman objected to USSSA management and made his objections known to colleagues.  Most notably, Plaintiff Wegman secured his

official whistleblower designation and protection in February 2023 under USSSA's formal Whistleblower Policy.

238.    The Defendants retaliated against Plaintiff Wegman by illegally terminating him on July 7, 2023, because of his whistleblower status and because he objected to, or refused to participate in, any activity, policy or practice in violation of a law, rule, or regulation.

239.    As a direct and proximate result, Plaintiff Wegman suffered and continues to suffer damages, including but not limited to economic and non-economic damages.

## COUNT TWELVE: VIOLATION OF THE FLORIDA PRIVATE WHISTLEBLOWER ACT (FLA. STAT. § 448.102(3)) – RETALIATION (BY PLAINTIFF HORROM AGAINST ALL DEFENDANTS)

240.    Plaintiff Horrom realleges and incorporates by reference Paragraphs 28 to 163 against all the Defendants as if fully set forth herein.

241.    Florida's Private Whistleblower Act, *Fla. Stat. Ann § 448.102*, prohibits an employer from retaliating against an employee who objected to, or refused to participate in, any activity, policy, or practice in violation of a law, rule or regulation.

242.    As set forth in detail above, over a period of at least five years, from 2018 to 2023, Defendants engaged in illegal and improper activities.  Plaintiff Horrom knew of and was a witness to much of the Defendants' illegal and improper

conduct, which violated USSSA's governing documents, state and federal tax laws, federal racketeering and other federal laws, as well as state statutory and common law.

243.   Plaintiff Horrom objected to USSSA management and made his objections known to colleagues.  In December 2022 and January 2023, Plaintiff Horrom objected in writing when he submitted anonymous reports to USSSA.

244.   The Defendants retaliated against Plaintiff Horrom by illegally terminating him on February 1, 2023, because of his whistleblower status and because he objected to, or refused to participate in, any activity, policy, or practice in violation of a law, rule or regulation.

245.   As a direct and proximate result, Plaintiff Horrom suffered and continues to suffer damages, including but not limited to economic and non-economic damages.

### COUNT THIRTEEN: BREACH OF FIDUCIARY DUTY
### (BY PLAINTIFFS WEGMAN AND HORROM AGAINST DEFENDANTS DEDONATIS, FORTUNA, AND ANDERSON)

246.   Plaintiffs Wegman and Horrom hereby reallege and incorporate Paragraphs 80 to 101 and 118 to 121 against Defendants DeDonatis, Fortuna, and Anderson above as if set forth herein.

247.   Florida law has long recognized that corporate officers and directors owe statutory and fiduciary duties to corporations, including not-for-profit

organizations. *Fla. Stat. Ann. § 617.0830*; *Fox v. Prof'l Wrecker Operators of Fl., Inc.*, 801 So.2d 175, 181 (Fla.Dist.Ct.App.2001).

248.   Defendants DeDonatis, Fortuna, and Anderson have served, and continue to serve, as directors and/or officers of Defendant USSSA.

249.   The officers and directors of Defendant USSSA, including Defendants DeDonatis, Fortuna, and Anderson have, and at all times relevant have had, a statutory and fiduciary duty to members and employees of USSSA, pursuant to *Fla. Stat. Ann § § 617.0830, 617.0832, 617.0833,* and Article IV of the Articles of Organization of Defendant USSSA.

250.   In the exercise of their duties as officers and directors of Defendant USSSA, Defendants DeDonatis, Fortuna, and Anderson have breached their statutory and fiduciary duties.

251.   The continuing breaches of duties by Defendants DeDonatis, Fortuna, and Anderson have constituted a continuing course of conduct that continues through the present.

252.   In the course of the wrongful conduct and breaches of the statutory and fiduciary duties outlined above, Defendants DeDonatis, Fortuna, and Anderson have acted with dishonesty, incompetency, and maliciously.

253.    Plaintiffs Wegman and Horrom are entitled to recover punitive damages from Defendants DeDonatis, Fortuna, and Anderson sufficient to punish each Defendant and to deter each Defendant from further wrongful conduct.

## COUNT FOURTEEN: INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (BY PLAINTIFFS WEGMAN AND HORROM AGAINST ALL DEFENDANTS)

254.    Plaintiff Wegman and Plaintiff Horrom hereby reallege and incorporate by reference Paragraphs 28 to 121 against all Defendants as if fully set forth herein.

255.    At all times since 2014 until his unlawful termination of employment described herein, Plaintiff Wegman had an ongoing and uninterrupted business relationship with USSSA through which he derived substantial income.

256.    At all times since January 2019 until his unlawful termination of employment described herein, Plaintiff Horrom had an ongoing and uninterrupted business relationship with USSSA through which he derived substantial income.

257.    At all times material to this action the Individual Defendants were fully aware of Plaintiffs Wegman and Horrom's business relationship with USSSA.

258.    While so aware of Plaintiffs Wegman and Horrom's business relationship with USSSA, the Individual Defendants took steps to intentionally and unjustifiably interfere with Plaintiffs Wegman's and Horrom's respective business relationships with USSSA by causing their termination of employment.

259.    The Individual Defendants interfered with Plaintiffs Wegman and Horrom's business relationship with USSSA as a result of their improper motive and by improper means in that they intended to punish and injure Plaintiffs Wegman and Horrom and to cover up their own illegal and improper misdeeds in violation of their statutory and fiduciary duties owed to USSSA, which had the effect of benefiting them personally and causing financial harm to USSSA.

260.    The Individual Defendants interfered with Plaintiffs Wegman's and Horrom's respective business relationship with USSSA for purely malevolent and unjustifiable reasons.

## **<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs Wegman and Horrom pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

a. A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the state of Florida and the United States of America;

b. An injunction and order permanently restraining Defendant USSSA and its partners, officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from

engaging in any such further unlawful conduct, including the policies and practices complained of herein;

c.  An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs Wegman and Horrom for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

d.  An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs Wegman and Horrom for all non-monetary and/or compensatory damages, including, but not limited to, compensation for emotional distress;

e.  An award of punitive damages, if applicable, in an amount to be determined at trial;

f.  Liquidated damages, if applicable;

g.  Prejudgment interest on all amounts due;

h.  An award of Plaintiff Wegman's and Plaintiff Horrom's reasonable attorneys' fees, and costs to the fullest extent permitted by law; and,

i.  Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs Wegman and Horrom hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: September 15, 2023

Respectfully submitted,

By:     /s/
　　　Jon May (FL 0276571)
　　　11122 Landsman Street
　　　Boca Raton, FL 33428
　　　(954) 439-6500
　　　jonmay.criminaldefense@gmail.com

　　　     /s/
　　　Michael Volkov (DC 367348)
　　　Ameer Gopalani (TX 24014711)
　　　*Pro Hac Vice*
　　　The Volkov Law Group PC
　　　1015 15th Street, N.W., 6th Floor.
　　　Washington, D.C. 20005
　　　(240) 505-1992
　　　mvolkov@volkovlaw.com
　　　agopalani@volkovlaw.com