# Exhibit 1

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("Agreement") is made and entered into as of the 1st day of January, 2022, by and between United States Specialty Sports Association, Inc., a Florida Not for Profit corporation ("Company) whose address is 5800 Stadium Parkway, Melbourne, FL 32940, and Brian Wegman ("Employee"), whose address is 2900 London Ridge Trail, Hamilton, OH 45013.

**WHEREAS,** the Company desires to employ the Employee as the Chief Operating Officer ("COO") of the Company; and

**WHEREAS,** the Company and Employee desire to enter into this Agreement in order to fully set forth the terms and conditions of his employment by the Company;

THEREFORE, in consideration of the foregoing premises, the mutual covenants and obligations of this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Employment and Term.**

    1.1 <u>Term.</u> The term (the "Term") of this Agreement shall commence on January 1, 2022 and shall continue until the third (3rd) anniversary of this Agreement, unless terminated sooner as provided hereunder. The date on which this Agreement is terminated pursuant to any applicable provision of this Agreement is referred to herein as the "Termination Date".

    1.2 <u>Duties and Responsibilities.</u> Employee will serve in the capacity of COO. Employee will assume the job title and all reporting responsibilities and duties, which are assigned and which may be changed from time to time, by Company's Chief Executive Officer ("CEO"). Employee will perform the obligations of a COO in a competent and professional manner, consistent with the expectations of Company's CEO.

    1.3 <u>Exclusive Services and Efforts.</u> Employee agrees to devote his efforts and energies and skill to discharge the duties and responsibilities attributable to his position, and except as set forth herein, shall devote all of his professional time and attention to the business and affairs of the Company. Notwithstanding the foregoing, the Employee will be entitled to (a) manage his personal and family investments and (2) engage in other business activities which are approved by the CEO in writing and which do not materially compete with the Company, in each case to the extent that such activities do not, individually or in the aggregate, materially interfere with the performance of his duties to the Company. For the avoidance of doubt, Employee understands and agrees that he may not play professional sports or provide services as a professional athlete, without the express written consent of the CEO.

    1.4 <u>Compliance with Company Policies.</u> To the extent not inconsistent with the terms and conditions of this Agreement and with due regard for his position, Employee shall be subject to all policies, practices, procedures, bylaws, and rules of the

Company, including but not limited to the policies set forth in the Company's Employee Handbook.

## 2. Compensation, Reimbursements and Benefits.

Company agrees to provide Employee the following compensation, reimbursements and benefits:

2.1 **Base Salary.** Provided the Employee satisfies the conditions precedent set forth in Section 2.2, during the first year of the Term, the Company will pay Employee an annual gross salary in the amount of THREE HUNDRED SIX THOUSAND THREE HUNDRED SEVENTY FIVE AND 00/100 DOLLARS ( $306,375.00) (the "Base Salary") payable pursuant to the payroll practices of the Company, which are subject to reasonable change at the sole discretion of the Company. The Base Salary shall be subject to an annual performance review and possible adjustment by the Company.

2.2 **Conditions Precedent.** The Employee is expected to relocate his permanent living location to the Brevard or Orange County areas by or before June 1, 2022. If the Employee fails to relocate his home address by specified date, he will be in material breach of this Employment Agreement.

2.3 **Incentive Compensation.** For each calendar year of the Term, the Employee shall be eligible to earn an annual bonus (the "Annual Bonus"), which shall be an amount determined by the CEO based on Employee's performance and attainment of the Annual Goals (as hereinafter defined). The amount of the Annual Bonus shall be between zero percent (0%) and sixty percent (60%) of the Employee's Base Salary. Employee's eligibility for the Annual Bonus shall be based upon measurable goals ("Annual Goals"), to be agreed upon by the CEO and the Employee by December 31 of each calendar year for the next year commencing in 2023. For calendar year 2022, the Annual Goals shall be agreed upon by the Chief Executive Officer and the Employee no later than March 31, 2022. The amount of the Annual Bonus shall be determined by the Chief Executive Officer taking into account, among other things, Employee's performance in achieving the Annual Goals. The Annual Bonus shall be paid no later than March 31st of the calendar year following the calendar year for which the Annual Bonus is awarded. For the avoidance of doubt except as set forth herein, this obligation shall survive termination or expiration of this Agreement.

2.4 **Annual Review.** On or before December 31 of each year of the Term, the CEO will conduct a performance evaluation of Employee's performance, including review of Annual Goals. The CEO shall promptly inform Employee of the results of the evaluation and award Incentive

Compensation on or before March 31 of the calendar year following the year for which the Incentive Compensation was earned.

2.5   Expenses. Company will reimburse Employee for ordinary, necessary and reasonable business expenses that Employee incurs in connection with the performance of Employee's duties [including entertainment, telephone, travel and miscellaneous expenses]. Employee must obtain proper approval for such expenses pursuant to Company's policies and procedures and provide Company with documentation for such expenses in a form sufficient to sustain Company's deduction for such expenses under the Internal Revenue Code. However, Employee may not incur expenses in excess of $10,000 without the prior written consent of the CEO.

2.6   Time Off. Employee will be entitled to 20 days of paid time off per year, 5 of which may be carried over annually.

2.7   Health Insurance and Other Employee Benefit Plans. Company will provide Employee with health insurance coverage and other employee benefits that are presently existing or which may be established in the future by Company for its full-time salaried employees, subject to the terms and conditions of the applicable benefit plans.

2.8   Moving Reimbursement. The Company will reimburse Employee up to $25,000 for the actual expenses incurred as a result of moving. Employee must submit an expense report documenting the actual expenses incurred. This one time reimbursement occurrence is planned for June 1, 2022 as Employee plans on completing said move near in time to this date.

3. **Termination.**

3.1   Termination For Cause. The Company may terminate Employee's employment with the Company for Cause at any time. In the event Employee is terminated for Cause, the Company shall have no obligation, except as otherwise required by law, to (a) pay a salary to Employee in accordance with the provisions of Section 2.1 or 2.2 (as applicable) except for the then applicable salary accrued through the date of such termination; or (b) provide any further benefits for the period following Employee's termination for Cause. "Cause" shall be defined as:

3.1.1   Any act or omission that constitutes a material breach by Employee of any of his obligations under this Agreement;

3.1.2   The willful or habitual failure or refusal of Employee to satisfactorily perform the duties reasonably required of him as an employee of the Company;

3.1.3   Employee's conviction of, or plea of *nolo contendere* to any felony or any crime involving dishonesty or moral turpitude or any other crime that could reflect negatively upon the Company or otherwise impair or impede its operations;

3

      3.1.4    Employee's engaging in any misconduct, negligence, act(s) of dishonesty (including, without limitation, theft or embezzlement), or any activity that could result in any violation of law, in each case, that is injurious to the Company;

      3.1.5    Employee's repeated willful or material breach of a written policy or rule of the Company;

      3.1.6    Employee's refusal to follow the directions of the CEO, unless such directions are, in the reasonable written opinion of legal counsel, illegal or in violation of applicable law;

      3.1.7    Any breach of Employee's duty of loyalty or fiduciary duties to the Company;

      3.1.8    Employee's use of alcohol or other drugs in a manner which affects the performance of Employee's duties, responsibilities, or obligations to the Company; or

      3.1.9    Any other misconduct by Employee that could reasonably be expected to injure the reputation, business or business relationships of Company and/or Employee.

3.2    <u>Termination without Cause.</u> In the event that the Company terminates Employee's employment without Cause, as defined in Section 3.1, Employee shall be entitled to receive: (a) his salary and Incentive Compensation in accordance with Section 2.3, and Section 2.1 or 2.3 (as applicable) for a period of one (1) year following the date of the termination without Cause; and (b) any and all benefits to which he is entitled for a period of one (1) year following the date of the termination without Cause. Employee shall have no further rights under this Agreement or otherwise be entitled to receive any other compensation or benefits after such termination.

3.3    <u>Resignation for Good Reason.</u> Employee may resign from his employment with Company for Good Reason upon thirty (30) days written notice to the CEO. "Good Reason" shall mean any one of the following events that is not cured by the Company within the thirty (30) day notice period: (1) Company's intentional and material breach of Company's obligations under this Agreement, or (2) working conditions created by Company, which are in violation of Employee's rights under any federal or state law. In the event that the Employee terminates his employment for Good Reason, he shall be entitled to receive: (a) his salary and Incentive Compensation in accordance with Section 2.3 and Section 2.1 or 2.3 (as applicable) for a period of one (1) year following the date of the resignation for Good Reason, and (b) any and all benefits to which he is entitled for a period of one (1) year following the date of the resignation for Good Reason. Employee shall have no further rights under this Agreement or otherwise be entitled to receive any other compensation or benefits after such resignation.

3.4    <u>Resignation by Employee without Good Reason.</u> Employee may resign his employment with the Company upon ninety (90) days written notice or such other

advance notice as may be mutually agreed upon between the Employee and the CEO following the provision of such notice, and his date of resignation shall be considered the date on which he is no longer employed, not the date on which he gives written notice. Employee shall only be entitled to receive: (a) his salary in accordance with Section 2.1 or 2.2 (as applicable) that has accrued up to the date of resignation; and (b) any and all benefits accrued up to the date of resignation. Employee shall have no further rights under this Agreement or otherwise be entitled to receive any other compensation or benefits after the date of resignation.

3.5   <u>Disability</u>. The Company may terminate the Employee's employment if he is disabled and unable to perform the essential functions of the Employee's then existing position or positions under this Agreement with or without reasonable accommodation for a period of ninety (90) days (which need not be consecutive) in any 12-month period. If any question shall arise as to whether during any period the Employee is disabled so as to be unable to perform the essential functions of the Employee's then existing position or positions with or without reasonable accommodation, the Employee may, and at the request of the Company shall, submit to the Company a certification in reasonable detail by a physician selected by the Company to whom the Employee or the Employee's guardian has no reasonable objection as to whether the Employee is so disabled or how long such disability is expected to continue, and such certification shall for the purposes of this Agreement be conclusive of the issue. The Employee shall cooperate with any reasonable request of the physician in connection with such certification. If such question shall arise and the Employee shall fail to submit such certification, the Company's determination of such issue shall be binding on the Employee. Nothing in this Section 3.5 shall be construed to waive the Employee's rights, if any, under existing law including, without limitation, the Family and Medical Leave Act of 1993, 29 U.S.C. §2601 et seq. and the Americans with Disabilities Act, 42 U.S.C. §12101 et seq.

3.6   <u>Death.</u> This Agreement and Employee's employment shall terminate automatically upon Employee's death.

3.7   <u>Obligations upon Termination.</u> Other than as specifically set forth or referenced in this Agreement, Employee shall not be entitled to any compensation, salary or benefits on or after termination.

4. **Covenant Not to Compete**

4.1 <u>Restrictive Covenants</u>. The Company has legitimate business interests in the preservation of its goodwill, its privileged and proprietary information and its customer relations and business contacts. The parties hereto have agreed to recognize and protect these interests by entering into the following covenants. The Company and Employee agree and acknowledge that the provisions and covenants contained within this Section 4 shall survive termination of this Agreement for any reason and shall be construed as an agreement independent of any other provision of this Agreement, notwithstanding any provision to the contrary within this Agreement.

4.1 <u>Non-Competition.</u>

    4.1.1 Employee agrees that he will not at any time during the Term and for a period of eighteen (18) months following the Termination Date resulting from the termination or resignation of his employment relationship with the Company for any reason, (the <u>"Restricted Period"),</u> whether voluntarily or involuntarily, directly or indirectly for himself or any other person or entity, solicit, interfere with or endeavor to entice away from the Company any client, business contact, sponsor, or other employee, or independent contractor of the Company. Additionally, Employee agrees that it shall be a violation of this Agreement to directly or indirectly employ any person who was in the employ of the Company within the preceding six (6) months, during the Restricted Period, as defined below, and this includes but is not limited to, any employment of a Company employee or independent contractor by Employee or any entity in which he has an interest, whether said interest is as an investor, employee, director, officer, partner, shareholder, or otherwise (other than a publicly traded company in which he has less than a five percent (5%) interest).

    4.1.2 Employee agrees that while employed by the Company and during the Restricted Period, Employee will not, for himself or on behalf of any person, partnership, trust, corporation or other entity other than the Company for whatever reason, participate in any of the following:

        4.1.2.1 Engage, directly or indirectly (either as an employee, officer, director, partner, shareholder, investor, consultant or independent contractor), in any business interest substantially similar to that carried on by the Company, including, but not limited to, the business of a sport's governing body that conducts sporting events, as of the Termination Date, within those areas in the United States (the <u>"Noncompetition Area")</u> in which the Company is doing business or has offices as of the Termination Date or in which, at the time of the Termination Date, the Company contemplates doing business.

        4.1.2.2 Be connected with or engage, directly or indirectly (either as an employee, investor, officer, director, partner, shareholder, consultant or independent contractor, or otherwise), in providing services or products or offering to provide products or services of the kind provided by the Company as of the Termination Date, for those customers or clients of the Company for whom the Company: (i) is engaged in providing services or products as of the Termination Date, or (ii) has either provided services or products within the twelve (12) month period prior to the Termination Date, or (iii) has contacted, as of the Termination Date, for the purpose of offering to provide services or products (all of which are hereinafter referred to as the "Customers" or "Clients");

        4.1.2.3 Solicit or attempt to solicit, directly or indirectly, those customers or clients for the purposes of providing or offering to provide any services or products of a type which the Company provides as of

        the Termination Date, on behalf of those customers or clients, whether directly or through any other persons, partnerships, corporations or other entities.

    4.1.2.4 Interfere with, solicit, hire, or entice away, directly or indirectly, any employee (any person who, as of the Termination Date, has been an employee, independent contractor, associate or agent of the Company at any time within the preceding six (6) months), to work for the Employee or for any other firm, person, or business, of whatever character, corporate or otherwise, with which the Employee has become or may become, associated with.

4.1.3  If in any judicial proceeding, a court shall refuse to enforce any portion of this Agreement or in particular any part of Section 4 of this Agreement, whether because the time limit is too long or because the restrictions contained herein are more extensive (whether as to geographic area, scope of business or otherwise) than is necessary to protect the business and goodwill of the Company, it is expressly understood and agreed between the parties hereto that this Agreement is deemed modified to the extent necessary to permit this Agreement to be enforced in any such proceedings.

4.1.4  If the Company or its successors in interest shall make application to a Court of competent jurisdiction for injunctive relief, then the Noncompetition Period specified herein shall be tolled from the time of application for injunctive relief until the date of final adjudication of the claim for injunctive relief. Additionally, Employee waives, to the greatest extent permissible, any requirement that the Company post bond or other security as a precondition to an injunction, whether temporary or permanent.

4.1.5  Employee acknowledges that at the time of this Agreement the Company is a sports governing body that conducts sporting events. Employee acknowledges that compliance with this Section is necessary to protect the goodwill and other proprietary interests of the Company and that a breach of this Section will give rise to irreparable and continuing injury to the Company, which is not adequately compensable in monetary damages or at law. Accordingly, Employee understands and agrees that the Company, its successors and assigns are entitled to obtain injunctive relief against the breach or threat of a breach of the foregoing provisions, in addition to any other legal remedies, which may be available to Company under this Agreement and applicable law. Employee further acknowledges that in the event of his termination or expiration of employment with the Company, his knowledge, experience and capabilities are such that Employee can obtain employment in business activities which are of a different or noncompeting nature than those performed in the course of employment with the Company; and that the enforcement of a remedy hereunder by way of injunction will not prevent Employee from earning a reasonable livelihood.

## 5 Confidentiality.

    5.1 <u>Unauthorized Disclosure.</u> Employee agrees that during the Term of Employee's employment and thereafter, Employee shall not make or cause to be made any unauthorized disclosure or other use of any confidential information regarding the Employer or any of its activities and operations, except to the extent reasonably necessary or appropriate in connection with the performance by Employee of Employee's authority and responsibility under this Agreement or as may be legally required; provided, however, that nothing herein contained shall preclude the use or disclosure of any information known generally.

    5.2 <u>Breach of Trust.</u> Employee acknowledges that he will learn and come in contact with certain proprietary information or products that the Company considers as being confidential or as being its trade secrets, as hereinafter defined. Employee understands that if, either during employment or thereafter, he discloses to others, uses for his own benefit or for the benefit of any person or entity other than the Company, copies or makes notes of any such trade secrets, information or products, such conduct will constitute a breach of the confidence and trust bestowed upon Employee by the Company and will be a breach of this Agreement. "Trade secret" shall mean the whole or any portion of any practice, procedure, policy, compilation of information, formula, pattern, device, or combination of devices, which is for use, or is used in the operation of the Company's Business and which provides the Company an advantage, or an opportunity to obtain an advantage, over those who do not know or use it. Trade Secret includes, but is not limited to, any scientific, technical or commercial information, including, but not limited to, any design, process, procedure, list of suppliers, list of customers, proprietary technology, sales technique, sales models, premium schedules or amounts, software platforms, source codes or improvement thereof. For purposes of interpretation hereunder the following shall apply:

> Irrespective of novelty, invention, patentability, the state of the prior art, and the level of skill in the business, art, or field to which the subject matter pertains, when the owner thereof takes measures to prevent it from becoming available to persons other than those selected by the owner to have access thereto for limited purposes, a trade secret is considered to be secret, of value, for use or in use by the business, and of advantage to the business; or providing an opportunity to obtain an advantage, over those who do not know or use it.

    In addition, a <u>"Trade Secret"</u> shall include information (not readily compiled from publicly available sources) which has been made available to Employee during the course of his employment, including but not limited to the names, addresses, telephone number, qualifications, education, accomplishments, experience and resumes of all persons who have applied or been recruited for employment, for either or both permanent and temporary jobs, job order specifications and the particular characteristics and requirements of persons generally hired by the Company, as well as specific job listings from companies with whom the Company does, or attempts to do business, as well as mailing lists, computer runoffs, financial or other information

8

not generally available to others, and all information defined as a trade secret by applicable Florida law and the laws of any state in which the Company does Business.

5.3 <u>Work Product: Works for Hire.</u> All processes, techniques, know-how, inventions, plans, products, devices, forms, summaries, or documentation discovered, learned, developed, made, created or invented by the Employee alone or with others in connection with the Employee during the time the Employee is engaged by the Company, specifically including, but not limited to source code, software platforms or applications, shall become and be the sole property of the Company. Employee agrees to execute all proper and necessary papers to protect the Company's rights in such property as may be presented to Employee by the Company at any time.

5.4 <u>Property of the Company.</u> Employee acknowledges that any trade secrets and/or confidential information furnished to Employee since the beginning of the Employee's employment by Company, or generated or obtained by Employee, during the period of time Employee is engaged by Company shall be and remain the exclusive property of Company. Employee hereby acknowledges and agrees that the maintenance of the confidentiality of the trade secret and/or confidential information, and the restrictions on use and disclosure of the trade secret and/or confidential information, are essential to the protection and preservation of Company's legitimate business interest and any trade secrets shall be entitled to all the protections and benefits afforded under Florida law. Employee covenants that he shall not at any time, whether during the Term of this Agreement or during the time frames prohibited by this Agreement, without the prior, express, written consent of the Company in each instance, disclose, divulge, or in any other way reveal, or cause another to do so, any trade secret or confidential information to any person, party, or entity, directly or indirectly. Employee shall not, for any purpose, except on behalf of the Company, utilize any of the trade secret or confidential information for Employee's own benefit, the benefit of any subsequent employer, any competitor of Company, or any third party. The restrictions set forth in this paragraph will not apply to any information that (a) is or becomes available to the general public through no breach of this Agreement by the Employee or (b) that Employee is required to disclose under applicable law.

5.5 <u>Intellectual Property.</u> USSSA trademarks and other USSSA Intellectual Property may be used by Employee only to the extent necessary to perform his respective duties as Employee and only so long as such use is in the furtherance of USSSA interests and activities. In addition, access to and use of USSSA Intellectual Property including websites, USSSA confidential information, and USSSA trade secrets may be used by Employee only to the extent necessary to perform his duties and only so long as such use is in the furtherance of USSSA interests and activities. Once Employee is no longer affiliated with USSSA, Employee must no longer use any USSSA Intellectual Property, trademarks, confidential information or trade secrets (including any data collected in the performance of Employee's USSSA duties) and may use the USSSA website only in a manner available to the public. Intellectual Property and rules pertaining to same include but are not limited to the following:

    5.5.1   Statistics including PRV, Power Ranking and USSSA Point Structure.

    5.5.2   Event Stature Names, Structure, and associated Points System.

    5.5.3   Website URLs (with USSSA in the URL) must be discontinued or sold to

      USSSA at the standard market value not exceeding the original purchase price upon the departure of Employee from USSSA. Any usage or forwarding to a competing organization or use in non-sanctioned events will constitute a breach of this Agreement.

   5.5.4 Social Media Accounts (with USSSA moniker) must be changed, or control turned over to USSSA upon the departure of Employee from USSSA.

   5.5.5 Using USSSA tools, websites, and screen captures, videos, training materials, and/or downloaded reports to create competing software is prohibited upon the departure of Employee from USSSA.

   5.5.6 Use of USSSA logos, images and likenesses is not permissible upon the departure of Employee from USSSA.

   5.5.7 Any team data collected from events not directly hosted by Employee explicitly belongs to USSSA.

5.6 <u>Return of Records.</u> On termination of employment, Employee shall deliver all records, notes, data, memoranda, models, and equipment of any nature that are in Employee's possession or under his control and that are the property of the Company or relate to the employment or to the business of the Company.

5.7 <u>Enforcement of Covenants.</u> In the event of a breach by the Employee of his obligations under Section 5 of this Agreement, the Employee hereby agrees that the remedy at law for his breach of any provision under this Section of this Agreement is inadequate and that, in addition to any other remedies the Company may have, according to this Agreement and/or at law or in equity, the Company is entitled to a preliminary restraining order and temporary and permanent injunctive relief, notwithstanding any provision to the contrary within this Agreement, without the necessity of proving actual damages. The Company and the Employee hereby understand, acknowledge, and agree that this covenant not to compete is reasonable in its limitation and necessary for the protection of the business of the Company and that the restraints imposed hereby are not unduly burdensome on the Employee. The parties further agree that if this covenant not to compete is found to be unenforceable by a court of competent jurisdiction by reason of the length of time, scope, or size of geographic area, it is the intention of the parties that this covenant not to compete be reformed by such court so that such period of time, scope or geographic area be reduced to the extent required to cure such invalidity. The parties also agree that this covenant not to compete shall be construed as an agreement independent of any other provision of this Agreement. The existence of any claim or cause of action that the Employee may have against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this covenant not to compete.

5.8 <u>Employment Claims.</u> Employee understands and agrees that any claim against the Company arising out of the Employee's employment relationship with the Company shall not constitute a defense to enforcement of the covenants contained herein.

5.9 <u>Notice of Agreement.</u> The Employee agrees that prior to accepting any employment or engagement by, or affiliation with, any such firm, person, or business which provides any of the services which are of the type of business provided by the Company, the

10

Employee shall notify any such firm, person or business of the existence and terms of the restrictive covenants contained in this Agreement, and shall furnish to such firm, person or business, a copy of the restrictive covenants contained in this Agreement.

5.10 Survival. The provisions of this Section, including subparts 5.1 through 5.10, shall survive the termination of this Agreement or Employee's employment with the Company for any reason.

5.11 Limitations on Other Employment. During the Term hereof, Employee shall not enter into the services of or be employed in any capacity or for any purposes whatsoever, whether directly or indirectly, by any person, firm, corporation or entity other than Company, and will not, during said period of time, be engaged in any business, enterprise or undertaking other than employment by the Company unless specifically authorized by the CEO in writing. Notwithstanding the foregoing and for the avoidance of doubt, nothing in this Agreement shall preclude Employee from being a passive investor in any entity or enterprise that does not compete with the Company.

## 6. Miscellaneous.

6.1 Complete Agreement. This written Agreement contains the sole and entire agreement between the parties as to the matters contained herein, and supersedes any and all other agreements, whether oral or written, between them. The parties acknowledge and agree that neither of them has made any representation with respect to such matters of this Agreement or any representations except as are specifically set forth herein, and each party acknowledges that he or it has relied on his or its own judgment in entering into this Agreement. The parties further acknowledge that statements or representations that may have been heretofore made by either of them to the other are void and of no effect and that neither of them has relied thereon in connection with its dealing with the other.

6.2 Governing Law. This Agreement and the performance hereunder and all suits and special proceedings hereunder shall be construed in accordance with the laws of the State of Florida. In any action, special proceeding or other proceeding that may be brought arising out of, in connection with, or by reason of this Agreement, the laws of the State of Florida shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which the action or special proceeding may be instituted. All actions under this Agreement shall be taken exclusively in Brevard County, State of Florida, and Employee hereby waives and agrees that he shall not assert that such forum is inconvenient.

6.3 Notices. Any notices given with regard to this Agreement (other than Company's notices or invoices with respect to amounts due hereunder) shall be in writing and shall be deemed to have been duly given on the date of service. Notices may be served (i) personally on the party to whom notice is to be given, (ii) by first class, registered or certified mail, postage prepaid, (iii) by overnight express courier (such as D.H.L. or Federal Express), or (iv) via fax or e-mail with a copy sent in accordance with (i), (ii), or (iii) and properly addressed as follows:

If to the Company:

United States Specialty Sports Association, Inc.
5800 Stadium Parkway
Melbourne, FL 32940

With a copy to:

Wendy Anderson, Esq.
1353 Palmetto Avenue, Suite 100
Winter Park, FL 32789

If to the Employee:

Brian Wegman
2900 London Ridge Trail
Hamilton, OH. 45013

or to such other addresses as either party hereto may from time to time give notice of to the other in the aforesaid manner. Employee agrees to provide Company notice of his permanent living location in Brevard or Orange County Florida on or before June 1, 2022.

6.4 <u>Benefits; Binding Effect</u>. This Agreement shall be for the benefit of and binding upon the parties hereto and their respective heirs, personal representatives, legal representatives, successors and, where applicable, assigns. Notwithstanding the foregoing, the Employee may not assign his rights or benefits hereunder without the prior written consent of the Company, which may be withheld for any reason or no reason at all. The Company may assign its rights and obligations hereunder to a third party in the event of a merger, consolidation or sale of the Company or substantially all of the Company's assets. This Agreement shall apply to current policies already placed through the Company and in force at the date hereof and all future policies that may be placed by the Company for Employee.

6.5 <u>Severability</u>. If any provision of this Agreement, or portion thereof, including, but not limited to, any section, sentence, clause, phrase, or word, or the application thereof in any circumstance is held invalid, the validity of the remainder of this Agreement shall not be affected thereby and shall be enforced to the greatest extent permitted by law. If such invalidity is caused by length of time or size of area, or both, the otherwise invalid provision will be considered to be reduced to a period or area, which would cure such invalidity.

6.6 <u>Waiver or Default</u>. Failure of Company to enforce any covenant, condition, or limitation of this Agreement or to otherwise terminate it because of a breach shall not be valid unless in writing and duly executed by the Company. No right or remedy herein conferred upon the Company is intended to be exclusive of any other right or remedy

12

contained herein, and every such right or remedy shall be cumulative and shall be in addition to every other such right or remedy contained herein and therein or now or hereafter existing at law or in equity or by statute or otherwise. Furthermore, no evidence of any modification shall be offered or received as evidence in any proceeding, arbitration or litigation between the parties arising out of or affecting this Agreement or the rights or obligations of any party hereunder, unless such modification is in writing, duly executed by the party to be charged therewith. The provisions of this paragraph may not be waived except as herein set forth.

6.7 No Strict Construction. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of construction shall be applied against any person. All of the parties to this Agreement have participated fully in the negotiation and preparation hereof, and, accordingly, this Agreement and the terms set forth herein shall not be more strictly construed against any one of the parties hereto.

6.8 Damages. Nothing contained herein shall be construed to prevent the Company or the Employee from seeking and recovering from the other damages sustained by either or both of them as a result of a breach of any term or provision of this Agreement.

6.9 Headings. The Section headings used throughout this Agreement have been inserted solely for convenience of reference and shall not be taken to limit or extend the natural and proper construction or meaning of the language employed within the paragraph.

6.10   Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same agreement.

6.11   Attorney's Fees. In any litigation or other action to enforce the terms and conditions of this Agreement, the prevailing party shall be entitled to recover reasonable costs and attorney's fee, including those incurred pre-litigation, and/or as the result of any litigation or appeal.

*(intentionally left blank)*

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement or have caused this Agreement to be executed by and through their authorized representatives as of the day and year first set forth above.

**SIGNED IN THE PRESENCE OF:**

"COMPANY"

UNITED STATES SPECIALTY SPORTS ASSOCIATION, INC.

_____  By: _____
Witness Signature              DONALD DEDONATIS, III, as
                               CHIEF EXECUTIVE OFFICER

_____
Witness Name (Print)

"EMPLOYEE"

_____  _____
Witness Signature          BRIAN WEGMAN
Witness Name (Print)

14

Exhibit 2

April 23, 2020

Mr. Rick Fortuna, Board of Directors Chair
United States Specialty Sports Association, Inc.
Via Email Only - rick.fortuna@usssa.com

RE: Investigation of Donny DeDonatis, III - USSSA CEO

Dear Rick:

This is in follow up to our conversation with you yesterday regarding our growing concerns related to Donny. This confirms our message to you that we have attempted to address these issues in a discreet fashion only to face opposition on all fronts. We know that you have been made aware of at least item 1.) below yet nothing has been done to adequately address them. These concerns and observations of inappropriate behavior in public are not from a disgruntled employee or from any single source with any motive adverse to Donny. The undersigned have not reached out to anyone seeking to solicit this information but were approached with these issues. These concerns have come from the employees, directors, vendors, sponsors and non USSSA individuals. It is totally inappropriate to fail to address these concerns immediately. The items related to Donny's behavior and actions, which must be investigated immediately, are as follows:

1.) Relationship with Courtney Ceo;
2.) Inappropriate payments of funds to Courtney Ceo where the true nature of the payments are intentionally disguised by Donny himself involving at least two (2) other employees other than himself and Courtney Ceo;
3.) Recreational use of illegal drugs and potential continued use of steroids;
4.) Improper management and poor decision making related to the overall well-being of the organization and the staff;
5.) Failure to pay Michigan State director fees, and
6.) Failure to repay or attempt to make arrangements to repay all of the improper loans, where the only plan seems to be continued extensions with no reasonable explanation, proposal or basis for same.

All of these specific items are in violation of one or more item in his contract and or the policies and procedures of USSSA.

We would like for an independent person to be appointed immediately to investigate these issues. The investigator and the process should be approved by the Board of Directors at the April 23, 2020 meeting. This investigator should have full authority to obtain any and all information and interviews from any employee or consultant of USSSA related to the investigation of all of the items set forth above and any other items discovered in the course of same. Donny's employment and pay during the investigation should be handled in accordance with his contract and applicable law based on legal advice. Donny should have absolutely no influence over the process. He should be required to take a full hair follicle drug test the same day of your receipt of this letter based on reasonable suspicion.

With best regards,

_____  _____  _____
Kevin Naegle – April 22, 2020    Joey Odom – April 22, 2020    Billy E. Loftin, Jr. – April 22, 2020

Exhibit 2